# PORT AUTHORITY OF CITY OF ST. PAUL AND OTHERS v. FRED W. FISHER.

145 N. W. (2d) 560.

October 7, 1966—No. 40,268.

*Dorsey, Owen, Marquart, Windhorst & West* and *William J. Hempel,* for appellant.

*Norman E. Biorn,* for respondent American Hoist & Derrick Company.

*Stephen L. Maxwell,* Corporation Counsel, and *Jerome J. Segal,* Assistant Corporation Counsel, for other respondents.

ROGOSHESKE, JUSTICE.

Plaintiffs by this action for declaratory judgment seek prior judicial approval of a proposed industrial development project by the Port Authority of the City of St. Paul, a municipal subdivision established pursuant to Minn. St. c. 458.

The proposed project includes public financing of the construction of an industrial building to be leased for 30 years to American Hoist & Derrick Company, a private manufacturing corporation. The building is to be erected upon a 1⅔-acre tract of land which is part of Riverview Industrial Park, previously acquired and cleared by the Authority as "marginal" lands for industrial use under powers granted by the legislature.

The question plaintiffs seek to have answered is whether in reclaiming and developing "marginal lands" it is constitutionally permissible under the public purpose doctrine to finance such construction through the issuance of revenue bonds and to lease the premises to the corporation in order to complete development of the land and recoup tax money expended for its acquisition and reclamation.

This is the second appeal brought by defendant, president of the Authority, who refused to sign the proposed lease to American Hoist, taking the position that financing construction was neither constitutional nor valid under c. 458. Defendant's first appeal, Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 132 N. W. (2d) 183, resulted in reversal of a summary judgment granted plaintiffs. That judgment was based upon a determination of the District Court of Ramsey County that the proposed use of revenue-bond proceeds was an authorized and constitutional expenditure of public money for a public rather than a private purpose. Our previous opinion fully sets forth the procedural history and alleged statutory basis for the Authority's proposal. Therein we determined that the lands constituting Riverview Industrial Park, acquired and made suitable for industrial use with the proceeds of general obligation bonds and tax money, were blighted or "marginal" lands as defined by

c. 458, that the acquisition was authorized and served a public purpose, and that the proceeds of revenue bonds constituted public money—all of which appears to be conceded by the parties upon this appeal.[1] However, our reversal, accompanied by a remand for the taking of testimony, was compelled because the record did not contain sufficient facts to establish the specific purpose the Authority intends to accomplish and—of critical importance—the necessity of public rather than private financing of the proposed construction. We held that these facts were essential to a determination of whether public financing of the construction served a public rather than a private purpose.

Upon remand, plaintiffs presented testimony and a large number of exhibits. Defendant called no witnesses. The district court, on the basis of comprehensive findings, again upheld the validity of the proposed use of the revenue-bond proceeds upon the ground that such expenditure was both authorized by c. 458 and constitutionally permissible. Defendant appeals from the judgment entered. Upon the record now before us, the question which we were unable to reach in our prior opinion and which now confronts us is whether the Authority's financing of the construction of a building for American Hoist, from the proceeds of revenue bonds, for the purpose of achieving productive industrial use of the land is an authorized expenditure of public funds—in short, whether all statutory and constitutional requirements of such proposed expenditure have been met.

The evidence submitted on remand is uncontroverted. This includes significant opinion testimony supporting plaintiffs' claim that completing reclamation of the marginal lands by putting them to productive use can

---

[1] Contrary to the declaration in our previous opinion, the Authority suggests that revenue bonds payable solely from its rents and income are not secured by the taxing power of the city of St. Paul and thus are not a debt of the city and should not be regarded as public funds. We believe the better and more realistic view is to so regard the proceeds because the risks and potential liability created and arising in the event of a default by industry or payment to bondholders could adversely affect the city's name and credit. See, Notes, 70 Yale L. J. 789, 793, and 40 Minn. L. Rev. 681, 686.

be accomplished only by public financing of improvements upon the land. Defendant's dispute concerns the conclusion drawn from the testimony. As we understand, defendant contends solely that it is not necessary for the Authority to finance the construction of an industrial building to achieve productive use of the land and that to do so results in an expenditure of public funds to serve primarily a private rather than a public purpose.

The testimony reveals that pursuant to legislative authority granted by c. 458, the Port Authority, from the proceeds of general obligation bonds issued with consent of the city, acquired by eminent domain a large area of "marginal land." The area acquired is located in St. Paul's "West Side," adjacent to the Mississippi River. Part of it (approximately 270 acres) is now designated as Area I of Riverview Industrial Park. The specific purpose of acquisition was to reclaim lands unquestionably "marginal"[2] within statutory definitions. The lands were cleared and replatted, and streets and utilities were reconstructed to take advantage of their location and suitability for light, nonoffensive industrial use. It is clearly established that prior to this acquisition private enterprise attempted, but was unable alone, to accomplish this reclamation and redevelopment. As disclosed by the testimony, the dominant purpose of acquisition was neither reasonably necessary to the successful operation of the port nor to induce industrial development to alleviate unemployment or economic distress. The dominant purpose was, and remains, the reclamation and redevelopment of "marginal lands," one of three purposes for which a Minnesota Port Authority was expressly empowered to create and develop industrial districts.[3]

---

[2] As defined by Minn. St. 458.191, subd. 4.

[3] As stated in Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 295, 132 N. W. (2d) 183, 196: "The provisions of Minn. St. 458.191 to 458.1991 are very broad and authorize the Port Authority to create and develop industrial districts * * * when such districts are reasonably necessary to the successful operation of the port. It would appear that it might exercise its power for the purpose of remedying 'marginal lands' within the entire city of St. Paul, whether or not such action is necessary to the successful operation of the port. And, even further, it would appear that the

Riverview Industrial Park, containing the tract proposed to be leased to American Hoist, is now prepared and ready for industrial use. Cost of acquisition, which includes damages paid prior owners, demolition, site improvement, and flood control, averages $1.50 per square foot. Its present market value, according to opinion testimony based upon comparable industrial property in the Twin City area, is between 40 and 60 cents per square foot. Although the Authority would prefer to sell the land to private interests, such sales cannot be accomplished with private financing at prices which will restore acquisition costs. No purchaser has been found willing to buy any part of the property at $1.50 per square foot. Opinion testimony also establishes that, because of lending restrictions imposed by governing agencies, no commercial mortgage lender would be willing or able to provide adequate financing to purchase the property at its acquisition cost.[4] Only 5 parcels of Riverview Industrial Park have been sold, 2 at 80 cents, 1 at 85 cents, and 2 small parcels at 90 cents and $1.05 per square foot. This disparity between the cost of acquiring and preparing the property for productive use and its market value is not unusual in the reclamation and redevelopment of blighted areas. Statutes relating to metropolitan housing and redevelopment authorities specifically recognize this and provide that the property may be sold at its reasonable market value.[5] As a matter of policy and based upon an administrative construction of § 458.197, the Authority has determined that redevelopment costs must be recaptured from the sale or

---

Port Authority has been extended powers whereby it may create and develop industrial districts for the simple purpose of establishing industrial developments in the city of St. Paul regardless of whether the land is marginal or the districts are reasonably necessary to the successful operation of the port."

[4] The premises proposed to be leased to American Hoist approximate 72,500 square feet out of approximately 8 million square feet comprising Riverview Industrial Park. To illustrate private financing available, assume acquisition costs of 100,000 square feet average $150,000 while market value is $40,000 to $60,000, 60 to 70 percent of which could be loaned to a qualified purchaser. Thus, a sale at acquisition cost of a 100,000-square-foot tract could only be accomplished with private financing if a purchaser were able and willing to invest over $100,000 of his own funds.

[5] Minn. St. 462.545.

lease of these marginal lands. Sales of those parcels which have been sold for less are justified on the theory that the price of every sale need not equal the average cost, provided the total cost be recouped when redevelopment is completed.

Acquisition costs approximate $12 million. If all available lands were sold at present market value, approximately $8 million of the proceeds of the general obligation bonds would not be recovered and the taxpayers of the city would bear this loss. The proposal to finance construction of the building is designed to recoup the full cost of reclamation and redevelopment of the land to be leased to American Hoist. Because of the 30-year term of the proposed lease, the lower interest rates on revenue-bond financing, and the nonprofit, tax-exempt character of the Authority, recoupment of both acquisition and construction costs can be realized. Opinion testimony indicates that a business enterprise can lease the improved property at a substantially lower monthly cost than it would pay if it acquired property elsewhere at a lower price and financed it on a commercial basis. For some companies the availability or nonavailability of municipal financing of industrial buildings means the difference between whether or not they will locate or remain in St. Paul. Many companies have expressed an immediate interest in leasing improved tracts, and 15 leases have been negotiated subject to our ruling in this case. Unless revenue-bond proceeds can be used to finance construction, it is believed that only 15 or 20 percent of the available land could be sold in 10 years' time at a price which would recapture costs.

The proposed lease to American Hoist requires it to pay all taxes levied against the property. The evidence proves, and the court found, that such payments, upon a value after construction estimated to cost in excess of $1,200,000, will benefit the public by increasing tax revenues, enlarging the tax base, and thereby enhancing the city's borrowing capacity, reduced because of the removal of substantial taxable lands condemned for interstate highway purposes. Further, productive industrial use of the land will directly and indirectly benefit the port facilities and advance the public welfare by creating and increasing employment opportunities.

However, the evidence does not establish that the contemplated pro-

posal is necessary to the successful operation of the port, since American Hoist ships its raw materials by rail or truck rather than by water and in the future will probably make very little use of the port facilities. Nor is there any evidence that St. Paul is economically distressed. In fact, an exhibit offered by the defendant indicates that in the period between 1955 and 1964 the city's unemployment rate was consistently lower than the state or national average.

The court found that the lands were marginal and that the primary purpose of acquiring them was "the reclamation of 'marginal lands,' by the development and redevelopment of an Industrial Development District." On the critical issue of the necessity of public rather than private financing, the court essentially determined that § 458.197 requires reimbursement of acquisition costs; that private financing is not available to finance the purchase of the lands at a price which would recover such costs; and that public financing of industrial construction through revenue bonds and a long-term lease is the only "apparent" method of recovering such costs, thereby accomplishing redevelopment of the lands.

Defendant concedes that the lands are "marginal" under many of the statutory definitions; that their acquisition and reclamation could only be accomplished by establishing an industrial district; and that reclaiming them for such use admittedly serves a public purpose. However, defendant questions the conclusion that municipal authority to construct and lease buildings to private enterprise is a necessary adjunct to proper reclamation of marginal lands. He contends that outright sale of the land, as now made suitable for use, or a long-term lease without constructing a building, as approved in the housing and redevelopment authority cases, can also accomplish reclamation and achieve development for productive use. Therefore, he argues, it is not essential that the Authority finance industrial construction and thereby necessarily expose itself to all the risks inherent in private financing.

Plaintiffs contend that the legislature, in delegating power to the Authority to reclaim and redevelop marginal land for industrial use, has expressly declared it to be in the public interest to sell or lease such lands and, if the public interest requires, to construct suitable buildings on the land for lease to private persons; that such objectives cannot be accom-

plished until the land is put to productive use; and that, since the means chosen by the Authority to achieve redevelopment is expressly authorized by the legislature and the public interest is served thereby, the expenditure of the proceeds of the revenue bonds should be upheld unless it is found that the device is manifestly unreasonable and arbitrary.

■ The parties to the action assume that by provisions of c. 458 the legislature has expressly authorized revenue-bond financing of industrial construction for lease to a private corporation. Section 458.192, subd. 10, provides:

"Such port authority shall have the authority to sell or lease the land held by it for river, harbor or industrial development in industrial development districts. It may, *if proper in the public interest,* construct suitable buildings or structures upon any land owned by it for the purpose of leasing the same to private persons in the further industrial development of such industrial district. It may exercise its authority, herein given, to the acquisition, development, sale or lease of single or multiple tracts of land to be developed, irrespective of size, having in mind that the purpose of Laws 1957, Chapter 812, is the industrial development of the district." (Italics supplied.)

Contrary to what the parties apparently assume, the statutory authority to finance construction of industrial buildings it not unlimited. This power can only be exercised "if proper in the public interest." Since this phrase is no more precise in its meaning than the public purpose doctrine embodied in the constitution, it is necessary to examine other provisions of the statutes which reveal what was intended by the legislature. Section 458.191, subd. 1, provides that the Authority may create industrial development districts, and subd. 2 then declares in pertinent part:

"It is hereby declared to be the public policy of the legislature * * * that it is in the public interest to empower the port authority to employ the power of eminent domain, and * * * to advance and expend public moneys for the purposes contained in Laws 1957, Chapter 812, and to provide for means by which marginal area properties may be developed or redeveloped *in accordance with the legislative policies hereinafter stated.*

"(1) A sound development of the economic security of the peoples of the city * * * is dependent upon proper development and redevelopment of marginal properties, * * *; and

"(2) The development and redevelopment of such marginal area properties cannot be accomplished by private enterprise alone without public participation and assistance * * *.

"(3) To protect and promote * * * the general welfare of the inhabitants of the port districts in which they exist, to remedying such injurious conditions through the employment of all appropriate means.

"(4) That whenever the development or redevelopment of such marginal lands *cannot be accomplished by private enterprise alone,* without public participation and assistance * * *, it is in the public interest to employ the power of eminent domain, to advance and expend public moneys for those purposes, and to provide for means by which such marginal lands may be developed or redeveloped." (Italics supplied.)

Bearing in mind that statutes are to be construed so as to uphold their constitutionality and carry out the legislative intent,[6] it is reasonable to conclude that the power to reclaim and develop marginal lands can be exercised only when the lands are in fact marginal and when their reclamation and redevelopment cannot be accomplished by private enterprise alone.[7] The record before us adequately establishes that these statutory limitations have been met. The area was beset with health and fire hazards, subject to repeated floodings, infested with large numbers of vermin and rodents, and regarded as one of the most blighted areas in the city. Comparisons between the cost of acquisition and the present market value of the lands convincingly demonstrate why private enterprise could not have accomplished the job. Despite defendant's failure to challenge plaintiffs' evidence or offer affirmative proof, he argues that once the marginal lands are reclaimed and made suitable for productive use, private

---

[6] Housing and Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673.

[7] The limitation may not be as strict if acquisition is determined to be necessary for the successful operation of the port facilities. Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635.

enterprise could complete development by purchasing the land at market value and constructing buildings. In short, defendant claims that public financing does not serve any public interest that could not be equally served by private financing.

Limiting our consideration to statutory as distinguished from constitutional limitations, we do not find the argument persuasive because it ignores the record upon which our decision must be based. As the court found upon uncontroverted testimony, private enterprise cannot finance the proposed construction since its capacity to do so is premised upon purchasing the land at one-third its cost, thus indirectly requiring the taxpayer to subsidize construction. It must also be accepted that no purchaser has been found who is willing to buy at a price commensurate with acquisition costs. Further, the testimony indicates that without public financing of construction, accomplishing productive use of the lands will be substantially delayed since only a small fraction of the lands during the course of a 10-year period could be sold at prices which would recapture costs. It must also be noted that the availability or nonavailability of public financing of construction through the issuance of revenue bonds is a determinative factor in inducing industry to locate in the industrial district under development, and that when productive use is achieved, economic benefits to the Authority, the city, and the people will ensue.

It cannot be said that the Authority's determination to recoup acquisition costs is either arbitrary or unreasonable or that such a policy does not serve the public interest. The inevitable consequence of a failure to recover such costs is that any deficiency would be borne by the taxpayers of St. Paul. Indeed, we might question in passing whether the governing body of the city would ever have consented to the issuance of $12 million of general obligation bonds had it not assumed that when redevelopment was completed, full reimbursement of the funds expended or advanced would be made.

Finally, if we accept defendant's argument we would render almost meaningless the provision granting authority to finance construction and lease because it could always be shown that at some stage of development a sufficient public subsidy by way of a below-cost sale price or otherwise would enable private enterprise to complete development. Rather,

we believe the legislature intended that if private enterprise cannot alone accomplish the entire financing of all stages of development, then the Authority may exercise all powers granted to it. Taking the record as we must in this case, we are constrained to hold that the trial court was justified in concluding that the contemplated proposal is authorized since the proof demonstrates that it is "proper in the public interest" within the contemplation of the statute. We do not hereby intend to indicate that mere proof of unavailability of private financing is alone sufficient to meet the statutory limitations on the exercise of the powers granted. We hold only that upon this record the proof adequately establishes that public financing of construction is in the public interest.

■ Defendant, however, rests his position on the contention that the proposed revenue-bond financing violates the public purpose doctrine now embodied in our constitution.[8] Without deviation we have held this doctrine permits taxing or spending public funds only for a public purpose. "Public purpose" is an elusive, amorphous concept incapable of precise definition. Thus, whether an expenditure serves a public purpose necessarily depends upon the facts of each case.

We need not repeat the broad general principles stated in Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635, and our prior opinion in this case, which must govern our decision. Applying those principles, we can approve the activity proposed to be financed with public funds only if the evidence establishes that such activity (a) will serve as a benefit to the community as a body; (b) is at the same time directly related to the functions of government; and (c) has as its primary objective the accomplishment of reclamation and redevelopment of marginal land and not the promotion of the private interests of American Hoist.

The final decision of what constitutes a public purpose rests with the courts. However, a legislative finding must carry great weight. In this regard, we call attention to the unequivocal determination by the legislature as contained in § 458.191, subd. 3(10):

"The development or redevelopment of land, or both, acquired under

---

[8] Minn. Const. art. 4, § 33, provides: "* * * The legislature shall pass no * * * law * * * authorizing public taxation for a private purpose."

the authority of Laws 1957, Chapter 812, constitute a public use and are governmental functions, and that the sale or leasing of such land after the same has been developed or redeveloped is merely incidental to the accomplishment of the real or fundamental purpose, that is, to remove the condition which caused said property to be marginal property as in Laws 1957, Chapter 812, defined."

We also note that the proposed activity under review is no longer uncommon in our nation. Many states seeking to clear blighted land have created public authorities with delegated powers to acquire and develop such lands by the investment of public funds and to sell or lease the lands to private persons, either with or without erecting buildings. Issuing revenue bonds is a common method used to finance improvements. An increasing number of states have enacted statutes and some, where found necessary, have amended their constitutions to authorize public industrial financing of factories and equipment as a means of inducing industrial development.[9]

Because of the differences in state constitutional and statutory provisions and the varying facts and circumstances found in cases arising in other jurisdictions, those cases offer little assistance. We are mindful, however, that where municipal industrial financing has been challenged upon the ground of the universally recognized public purpose doctrine, a public purpose has been found whenever the location of industry would serve to alleviate problems of unemployment, inadequate wages, economic depression, or imbalance of agriculture over industry,[10] or would appreciably increase the use of port or harbor facilities [11] — none of which is the

---

[9] See, Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach,* 111 U. of Pa. L. Rev. 265; Note, 70 Yale L. J. 789. See, also, Note, 66 Harv. L. Rev. 898.

[10] DeArmond v. Alaska State Development Corp. (Alaska) 376 P. (2d) 717; In re Opinion of the Justices, 54 Del. 366, 177 A. (2d) 205; Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N. W. (2d) 5; Dyche v. City of London (Ky.) 288 S. W. (2d) 648; City of Frostburg v. Jenkins, 215 Md. 9, 136 A. (2d) 852; Roe v. Kervick, 42 N. J. 191, 199 A. (2d) 834; Village of Deming v. Hosdreg Co. 62 N. Mex. 18, 303 P. (2d) 920; Gripentrog v. City of Wahpeton (N. D.) 126 N. W. (2d) 230.

[11] Ports Authority v. Trust Co. 242 N. C. 416, 88 S. E. (2d) 109.

primary objective of the project under review. Some jurisdictions do so under constitutional provisions specifically authorizing such financing.[12]

Turning to an analysis of the record, we believe it is demonstrated by our discussion of the public interest limitation imposed by statute that the community as a body will clearly be benefited by achieving productive use of the reclaimed marginal lands in question. In Asch v. Housing and Redevelopment Authority, 256 Minn. 146, 97 N. W. (2d) 656, upholding the reclamation of blighted lands and a sale thereof to private persons for commercial development, we expressly recognized that reclamation of such lands confers a general community benefit. We also declared our refusal to overrule a legislative finding that such activity constituted a public benefit in the absence of evidence that the legislative determination was arbitrary and unreasonable.[13] The same applies in this case.

As defendant ably argues, the greatest difficulty appears in classifying the proposal as an activity directly related to the functions of government. When financing construction is separated from the dominant purpose underlying the activity, it appears as an unprecedented proprietary function of government clearly not entitled to sanction by any court adhering to the public purpose doctrine. However, when viewed as a necessary adjunct to complete redevelopment of marginal lands because of the unavailability of private financing to effect recoupment of acquisition costs, the activity cannot be fragmentized. Since the evidence establishes that the proposed revenue-bond financing and lease is an integral part of the redevelopment project, we must view the activity in its entirety. The question then becomes whether the acquisition, reclamation, and completion of redevelopment achieved by revenue-bond financing and lease is a governmental function. Such is the finding of the legislature. Judicial restraint

---

[12] Wayland v. Snapp, 232 Ark. 57, 334 S. W. (2d) 633; Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So. (2d) 394; Martin v. Maine Sav. Bank, 154 Maine 259, 147 A. (2d) 131; State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N. W. (2d) 63; Sublett v. City of Tulsa (Okla.) 405 P. (2d) 185.

[13] See, also, Thomas v. Housing and Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175; Housing and Redevelopment Authority of St. Paul v. Greenman, 255 Minn. 396, 96 N. W. (2d) 673.

in this relatively new and expanding area of governmental activity would justify our deference to the legislative determination no less than in the housing and redevelopment cases. Surely, it must be recognized that the legislature has available to it helpful resources usually unavailable to courts in an adversary proceeding by which to weigh the economic, social, and political considerations supporting its determination.

What we said about "public use" in State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 16, 176 N. W. 159, 161, 8 A. L. R. 585, applies equally to the "governmental function" concept. There we said:

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. * * * 'The term "public use" is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution.' [Citation omitted.] What constitutes a public use at the time it is sought to exercise the power of eminent domain is the test. The Constitution is as it was when adopted, but, when it employs terms which change in definition as conditions change, it refers to them in the sense in which they are meant when the protection of the Constitution is sought. The Constitution of this state nowhere attempts to define what may be a public use, nor does it prohibit the legislature from determining what shall be deemed such a use."

Although one may have grave misgivings about the wisdom of the proposal, it must be noted that private enterprise today simply has not been willing or able to finance development of large areas of blighted lands held in greatly divided ownership without public financial assistance. Such has been the case in the past in undertaking slum clearance and development of low-rent housing and, less recently, the development of airports and port facilities. Indeed, many states have allowed use of the construction and lease-back device solely as an inducement to industry, even though the project did not, as here, constitute an integral part of marginal-land reclamation and without requiring proof that private financing is unavailable to recoup reclamation costs. Essentially, leasing publicly financed industrial buildings necessarily constructed to complete a rec-

lamation project differs in no significant degree from leasing airport facilities constructed with public funds as necessary and incidental to the control of air traffic and public safety.[14] The same comparison appears justified with respect to the activity of financing the construction and improvement of port facilities as part of an overall redevelopment scheme, an activity which was approved in Visina v. Freeman, *supra*. Strongly influencing that decision was the fact that, historically, establishment and maintenance of ports have universally been regarded as a function of government. Nevertheless, even though each of the activities mentioned has different historical origins and differs in the degree of control retained by the municipal agencies, the fundamental nature of each activity as a means of performing a function which private enterprise could not accomplish alone is not dissimilar. Thus, each can be regarded as a governmental rather than a proprietary function and any attempted constitutional distinction is unjustified. As the language of Houghton suggests and as the record justifies, the flexibility of our constitutional public purpose concept supports the conclusion that the contemplated project is directly related to the functions of government.

We are also persuaded that any benefits admittedly derived by American Hoist are only incidental to the accomplishment of the primary purpose of achieving redevelopment of the lands in question. Public financing is generally viewed as a most beneficial aid to industry since it frees working capital otherwise invested in buildings for use in promoting other business interests. Also, the city-owned buildings, usually built to company specifications, very often are tax-exempt. The low interest rates possible because of the present tax-exempt status of municipal revenue bonds and the nature of long-term leases permits attractive rental charges which the enterprise can deduct for income tax purposes. But, we must be careful not to exaggerate these benefits under the facts and circumstances of this case. American Hoist will be liable for ad valorem taxes. The separate rental it must pay for the land is computed at a price three times its market value, deemed necessary to recoup acquisition costs. Surely, recoupment of these costs does not constitute a private benefit, for the evi-

---

[14] Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201.

dence is that it is the taxpayer rather than a private interest whom the Authority is attempting to serve.

Defendant's argument that the land should be sold to American Hoist at market value implies that in such event any benefit to American Hoist would be substantially less and clearly incidental to the redevelopment project. No evidence supports this implication. While revenue-bond financing may amount to a direct subsidy, selling the land at one-third its cost is merely an indirect way of subsidizing private interests. This record affords no basis for comparing the benefits derived, much less for determining from which subsidy a private interest would derive the greater benefits.

The trial court determined that § 458.197[15] requires recoupment of costs. Although we doubt that this provision must be construed as a mandatory requirement to recoup the costs, we decline to construe the statute because the issue was neither directly raised nor briefed on this appeal. It is noteworthy, however, that c. 458 contains no provision expressly authorizing private subsidies from taxpayers by way of sales below cost as in the housing and redevelopment statutes.[16] It should also be recalled that the origin and underlying basis of the public purpose doctrine as developed by the courts was not primarily directed at the favoritism enjoyed by private interests but to prevent the heavy financial losses and

---

[15] Section 458.197 provides in part: "Such port authority is hereby granted the power to advance its general fund moneys or credit, or both, without interest, to accomplish the objects and purposes of sections 458.191 to 458.1991, which advances shall be repaid from the sale or lease, or both, of such developed or redeveloped lands, provided, if the money advanced for such development or redevelopment was obtained from the sale of general obligation bonds of the port authority, then such advances shall bear a rate of interest not less than the average annual interest rate on general obligation bonds of the port authority which are outstanding at the time such advances are made. Nothing herein shall prevent the port authority from advancing the money so repaid for the accomplishment of further objects and purposes authorized by such laws, subject to repayment in the same manner."

[16] Though, significantly, the Municipal Housing and Redevelopment Act (§ 462.551) also provides that the bonds or other obligations of the Housing Authority shall not be a debt of the parent municipality.

liabilities incurred by publicly financed railroads.[17] Thus, when § 458.197 is read in conjunction with § 458.193, subd. 1, authorizing the issuance of general obligation bonds without submission to a vote of the electorate or subject to the debt limitation imposed by the city charter, a legislative declaration that recoupment serves a public purpose arguably appears. Bearing these factors in mind, we would not be justified upon this record in holding that the Authority's policy of recoupment is in furtherance of a private interest and therefore arbitrary and unreasonable.

In Sanborn v. Van Duyne, 90 Minn. 215, 223, 96 N. W. 41, 42, we said that private property cannot be taken initially for a public purpose and later diverted for a private use. This is just another way of stating that the public purpose doctrine prohibits spending public funds for a private purpose where the public purpose is only incidentally served. Again, there is no evidence of such a diversion of public funds in this case or even the slightest suggestion that the redevelopment project was undertaken to finance construction of a building for American Hoist or for private industries generally. The record is replete with evidence that the public financing contemplated constitutes an integral and necessary step in accomplishing the development of the marginal lands in question.

If the lands in question were not marginal or if the building to be erected were not admittedly an industrial building, this would be evidence of an intent to serve a private purpose. The same would be true if accomplishing the reclamation of the lands could be achieved without public assistance or if the revenues derived from the proposed lease were insufficient to recoup acquisition costs. The evidence, however, is otherwise and supports the conclusion that only by leasing a publicly financed building can acquisition costs be recouped, productive use of the reclaimed lands in question be accomplished, and such use of other tracts presumably be accelerated. These, along with the other public benefits of increasing the tax base and tax revenues, improving employment opportunities, and the not unreasonable expectation following this initial project of increasing the use of port facilities, amount to substantial public benefits. The fact

---

[17] See, Notes, 66 Harv. L. Rev. 898, 900, and 59 Col. L. Rev. 618, 620, 623, 628.

that American Hoist also benefits is, as the legislature has declared, "merely incidental to the accomplishment of the real or fundamental purpose, that is, to remove the condition which caused said property to be marginal." For these reasons we uphold the decision of the trial court that the proposed project, including construction and lease of an industrial building, serves a public and only incidentally a private interest.

Affirmed.