John F. LIFTEAU, Respondent,

v.

METROPOLITAN SPORTS FACILITIES COMMISSION, Appellant,

Arthur C. Roemer, Minnesota Commissioner of Revenue, Appellant,

Metropolitan Council, Appellant.

No. 49051.

Supreme Court of Minnesota.

Aug. 4, 1978.

Rehearing Denied Sept. 5, 1978.

Mastor & Bale, and Wayne H. Olson and David R. Knodell, St. Paul, for Metro. Sports Fac. Comm.

Warren Spannaus, Atty. Gen., C. Hamilton Luther, Deputy Atty. Gen., St. Paul, for Roemer.

Forrest D. Nowlin, Jr., and John Hoeft, St. Paul, for Metro. Council.

Johnson, Essling, Williams, Essling & Daly, St. Paul, for respondent.

YETKA, Justice.

Appeal by defendants from an order of the Ramsey County District Court enjoining them from implementing L.1977, c. 89, the Metropolitan Sports Facilities Act. The district court held that the expenditures in the Act were for a public purpose and that the metropolitan area was a proper taxing district. The court ruled, however, that the Act was unconstitutional because it failed to express its subject fully in its title; it failed to pass the legislature by a three-

fifths vote; and it impermissibly excluded three metropolitan municipalities from its taxing provisions. Plaintiff has sought review of the district court's ruling on public purpose and proper taxing district. We reverse the district court because we find the statute constitutional.

Plaintiff John Lifteau, the owner of a bar and restaurant in Washington County, brought suit to enjoin implementation of L.1977, c. 89, the Metropolitan Sports Facilities Act (the Act) on constitutional grounds. The Act passed the House on May 10, 1977 by a vote of 70 to 61. It passed the Senate on May 11, 1977 by a vote of 39 to 27. Neither house passed it by a three-fifths majority.

The Act may be summarized as follows:

The Act established the Metropolitan Sports Facilities Commission (Commission) consisting of seven members. Four of the members, including the chairman, come from outside the metropolitan area.[1] The primary duties of the Commission are operation of sports facilities and selection of site, design, and construction of new or remodeled sports facilities, Minn.St. 473.556.

The Act further transferred ownership of the metropolitan sports area to the Commission. The Commission has taken over operation of these facilities. As a part of the transfer the Commission assumed the payment of general obligation and revenue bonds of the city of Minneapolis, originally issued to finance Metropolitan Stadium.

The employees of the metropolitan sports area commission became Commission employees upon transfer of ownership, Minn.St. 473.564.

After the Commission has made its decisions on site and design it will present its proposal to the Metropolitan Council (Council), Minn.St. 473.571, subd. 6.[2] If the Council concludes that the Act's requirements have been met, it will then issue bonds to finance construction of the sports facilities, Minn.St. 473.581, subd. 3. The statute sets out extensive conditions which must be met before bonds can be issued: (a) the Commission must execute agreements with major league professional football and baseball teams to insure use of the facilities for a period of time necessary to generate revenues to retire the bonds; (b) the Commission must execute agreements to insure continued major league baseball and football franchises in the metropolitan area; (c) the proceeds of the bonds must be sufficient to finance the stadium; (d) property must be acquired; (e) funds must be received to insure clearance of the property acquired; (f) no strike and no lockout agreements must be entered with construction unions and contractors; (g) construction contracts must be executed; (h) environmental impact statements must be approved; (i) at least 50 percent of the private boxes provided in the facility must be leased for 5 years; (j) revenues must be adequate to pay bond

---

1. As used herein, the metropolitan area means the counties of Hennepin, Ramsey, Scott, Carver, Washington, Dakota, and Anoka, see, Minn.St. 473.121. Since the passage of the Act, the portion of the city of New Prague in Scott County has been removed from the definition of the metropolitan area, L.1978, c. 543, § 1.

2. The Commission is required to consider the following:
"* * * (a) access to the locations from the rest of the metropolitan area and the state, (b) access to parking and public transit, (c) environmental impact, (d) total capital and operating costs to the commission and total commission revenues over the expected life of the facility, including the sale of land by the commission and any contributions by local units of government or other organizations, (e) the re-

port of the council, (f) the availability of land and utilities, (g) the total governmental costs associated with the construction and operation of the commission's facilities, including the cost to all units and agencies of government as well as the cost of the commission, (h) the net gain or loss of property taxes to all local governmental units, (i) the feasibility of funding a portion of the total cost through a grant or grants from the economic development administration of the federal government, (j) the feasibility of constructing a waste facility or a solar energy system to provide energy for heating and ventilating the sports facility, and (k) the needs of the university of Minnesota for athletic facilities for a prospective 20 year period."
It must also hold hearings within and outside the metropolitan area.

debt service and substantial operating expenses; (k) the needs of the University of Minnesota for athletic facilities over 20 years must be considered. Commission revenues from operation of the facilities, proceeds from an admission tax, Minn.St. 473.-595, subd. 1, and, to the extent necessary, proceeds from a 2 percent on-sale liquor tax will be used to pay off the bonds, Minn.St. 473.581, subd. 4.[3]

On August 1, 1977, the Council imposed a 2 percent tax on the retail sale of intoxicating liquor and fermented malt beverages. The taxing district was defined as the metropolitan area excluding those portions of the city of New Prague in Scott County and the cities of Rockford and Hanover in Hennepin County, Minn.St. 473.591, subd. 1.

New Prague, Hanover, and Rockford are the only municipalities lying partly within and partly without the metropolitan area that have licensed on-sale establishments or municipal liquor stores both within and without the metropolitan area. All have substantial portions of their populations within and without the metropolitan area. Dayton, another municipality lying both within and without the area, was not exempted. Its population is almost entirely within, and its only liquor establishments are both within the metropolitan area.

The tax is collected by the subject liquor establishments; it is reported and paid to the Commissioner of Revenue along with state sales and use tax. It is subject to the same penalties, interest, and enforcement provisions as the state sales and use tax, Minn.St. 473.591, subd. 2. The tax proceeds, less refunds and collection costs are remitted to the Council for debt service on its bonds and revenue anticipation certificates. One-half the first year's tax was reappropriated to pay Commission expenses, Minn.St. 473.591, subd. 3.

After August 1, 1980, when the tax expires, the Council may reimpose it in an amount sufficient to produce revenues equal to principal and interest on outstanding bonds, but limited to a maximum of

$4,500,000 in any year. Collection is suspended at the end of any calendar year when the Council determines that it has sufficient revenues to pay the principal and interest on the bonds coming due within the next 3 years, Minn.St. 473.591, subd. 2.

The major league professional sports teams presently using Metropolitan Stadium are the Minnesota Twins baseball team, the Minnesota Vikings of the National Football League, and the Minnesota Kicks of the North American Soccer League. In 1977 the other users of Metropolitan Stadium were the Minnesota All-Star High School Football Game, Ice Bike Championship, and the Minneapolis-St. Paul Police Federations Benefit Game. In 1976 the users other than professional sports teams were Freedom Fest, All-Star High School Football Game, a rock concert, and the Police Federations Benefit Game. In 1973, 1974, and 1975 the Police Federations Benefit Game was played in Metropolitan Stadium.

The legal issues raised in this appeal are:

1. Does the title of the Act express its subject as required by Minn.Const. art. 4, § 17?

2. Does the construction of a publicly owned sports facility for use by professional sports organizations have a public purpose for which public funds may be expended?

3. Is the metropolitan area a proper taxing district for the levying of a 2 percent on-sale liquor tax for financing of the Metropolitan Sports Facilities Commission?

4. Does the exemption of New Prague, Rockford, and Hanover from the 2 percent tax violate the equal protection clause of the Fourteenth Amendment to the United States Constitution or the uniformity clause of Minn.Const. art. 10, § 1?

5. Does the Act create a public debt for internal improvements within the meaning of Minn.Const. art. 11, §§ 3, 4, and 5(a), and thus require a three-fifths vote of the legislature for its passage?

---

3. The Council is also empowered to issue revenue anticipation certificates in anticipation of revenues from the 2 percent tax, Minn.St. 473.-581, subd. 5.

(1) Were we to declare the Act invalid by reason of its title, we would place in jeopardy many acts passed over the years by the Minnesota Legislature. One must understand the growing complexity of the legislative process in modern times. Minn. Const. art. 4, § 17, states:

"No law shall embrace more than one subject, which shall be expressed in its title."

■ As we have said in numerous decisions by this court, the purpose of this section is to alert legislators and the public as to content of a proposed law.[4] Although the district court held that the title of the Act failed to give adequate notice of the provisions for the takeover of the metropolitan sports area, we disagree. The first three clauses of the title—"An act relating to metropolitan government; providing for sports facilities; establishing a sports commission and prescribing its powers and duties; * * * "—give as much notice of the provisions of the Act as has been heretofore required by our cases. The title of the Act was not restrictive in the sense argued by plaintiff, cf., *State ex rel. Finnegan v. Burt*, 225 Minn. 86, 88, 29 N.W.2d 655, 656 (1947); *Watkins v. Bigelow*, 93 Minn. 210, 222, 100 N.W. 1104, 1108 (1904). The result of allowing the district court's decision to stand would be to require the title of a bill to be a complete index of its provisions. This result is not required by our constitution. See, *Wass v. Anderson*, Minn., 252 N.W.2d 131, 137 (1977).

Respondent has suggested that a broader title, such as, "An act relating to metropolitan government," might be sufficient if that had been the title of the act. We fail to see how such a title would better serve to alert either the legislature or the public.

We take judicial notice of the fact that for two legislative sessions no proposal received broader coverage both in the news media and within the legislative process itself than the proposed stadium bill. The legislative hearings were open and full discussions and deliberations were had. Plaintiff has chosen the wrong act on which to raise this issue.

■ (2) The district court found that a public purpose exists in the proposed stadium. Plaintiff argues, however, that this case should be controlled by *Burns v. Essling*, 156 Minn. 171, 194 N.W. 404 (1923), in which this court held that financing of a hockey rink by the city of Eveleth for use by the Eveleth Athletic Association, a nongovernmental organization which sponsored a hockey team, did not serve a public purpose. Since that case was written 55 years ago, most jurisdictions considering the issue have concluded that a sports stadium serves a public purpose.

In every case considering the issue except two—*Brandes v. City of Deerfield Beach*, 186 So.2d 6 (Fla.1966), and *In re Opinion of Justices*, 356 Mass. 775, 250 N.E.2d 547 (1969)[5]—it has been held that the acquisition or construction of a stadium to be used

---

4. *Watkins v. Bigelow*, 93 Minn. 210, 222, 100 N.W. 1104, 1108 (1904); *State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 552, 287 N.W. 297, 301 (1939), affirmed, 309 U.S. 270 (1940); *Visina v. Freeman*, 252 Minn. 177, 202, 89 N.W.2d 635, 654 (1958); *Wass v. Anderson*, Minn., 252 N.W.2d 131, 137 (1977).

5. *Brandes v. City of Deerfield Beach, supra*, is clearly distinguishable from the present situation; in that case the city attempted to finance facilities for use by the Pittsburgh Pirates, a major league baseball team, during spring training. The public interest in spring training games of a single team is obviously less than the public interest in a multi-purpose stadium to be used for professional (regular season and post season) and nonprofessional athletic events and nonathletic events. In addition, al-

though in *In re Opinion of the Justices, supra*, the Massachusetts Supreme Court found no public purpose in the construction of a sports facility, its objection apparently was to nature of the specific statute involved rather than the concept of a stadium. The court stated (250 N.E.2d 558):

"We are of the opinion that a large multi-purpose stadium or an area for public activities and events, conventions, professional and amateur athletic events, and other large gatherings may be for a public purpose if the expenditures of public funds, the extension of public privileges, powers, and exemptions, and the use, rental, and operation of the projects are adequately governed by appropriate standards and principles set out in the legislation."

in part by one or more professional sports teams constitutes a public purpose for which public expenditures could be legally undertaken.[6]  *City of Los Angeles v. Superior Court,* 51 Cal.2d 418, 333 P.2d 745 (1959); *Ginsberg v. City and County of Denver,* 164 Colo. 572, 436 P.2d 685 (1968); *Alan v. County of Wayne,* 388 Mich. 210, 200 N.W.2d 628 (1972); *Bazell v. City of Cincinnati,* 13 Ohio St.2d 63, 233 N.E.2d 864, certiorari denied and appeal dismissed, 391 U.S. 601, 88 S.Ct. 1865, 20 L.Ed.2d 845 (1968); *Meyer v. Cleveland,* 35 Ohio App. 20, 171 N.E. 606 (1930); *Martin v. Philadelphia,* 420 Pa. 14, 215 A.2d 894 (1966); cf., *Reyes v. Prince Georges County,* 281 Md. 279, 380 A.2d 279 (1977). See, also, Annotation, Validity of Governmental Borrowing or Expenditure for Purposes of Acquiring, Maintaining, or Improving Stadium for Use of Professional Athletic Team, 67 A.L.R.3d 1186, 1193 to 1197 (1975).

These decisions from other jurisdictions appear to be consistent with the current status of the public purpose doctrine in Minnesota as it has evolved in the 55 years since *Burns.* In *R. E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 339 (Minn., 1978), this court found a public purpose in expending public monies to induce private development in an urban development district, relying on numerous Minnesota cases which permitted such inducements, as follows:

" * * * We have gone so far as to approve the condemnation of land by a public authority and its later sale or lease to private developers, *Housing & Redevelopment Authority of St. Paul v. Greenman,* 255 Minn. 396, 96 N.W.2d 673,

and the construction of buildings by the public authority to be leased to private persons, *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594; *Port Authority of City of St. Paul v. Fisher,* 275 Minn. 157, 145 N.W.2d 560; *Visina v. Freeman,* 252 Minn. 177, 89 N.W.2d 635; *Erickson v. King,* 218 Minn. 98, 15 N.W.2d 201, as permissible inducements to lure the private sector into the redevelopment plan."

The *Burns* case can be distinguished in that in *Burns* the city of Eveleth was attempting to bail out the Eveleth Athletic Association and pay its bills for a project already started.  The eventual effort of the city to take over the hockey rink was a subterfuge to pay the bills of private parties.  Such is not the case here.

Moreover, times, conditions, and interests change over the years.  As this court said in *Central Lumber Co. v. City of Waseca,* 152 Minn. 201, 188 N.W. 275 (1922), where we upheld a municipal operation of a lumber and coal yard:

"Economic and industrial conditions are not stable.  Times change.  Many municipal activities, the propriety of which is not now questioned, were at one time thought, and rightly enough so, of a private character.  The constitutional provision that taxes can be levied only for public purposes remains, but conditions which go to make a purpose public change."

The trial court found that the public desire for sports facilities was great and we may take judicial notice of the important part that professional sports plays in our social life.  In addition, although uses of

**6.**  Plaintiff attempts to distinguish the cases on the basis that the facilities involved were to be funded solely by revenue bonds unsupported by any tax or that the respective state constitutions required voter approval of the expenditures.  Recently, however, this court held in *R. E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, (Minn., 1978), that extraneous factors such as the mode of financing have no bearing on the issue of public purpose, citing *People ex rel. City of Urbana v. Paley,* 68 Ill.2d 62, 73, 368 N.E.2d 915, 920 (1977), as follows: "We might note here the attempt of the mayor to characterize as critical the distinction between gener-

al obligation bonds and revenue bonds. * * We believe this contention to be illogical. * * At issue in this case, * * * is not the existence of a pledge of credit, but rather the nature of the ultimate purpose for which money is spent or credit is pledged or extended.  A public purpose insulates the bonds from constitutional attack, whether they be general obligation or revenue bonds."  The same reasoning should be applicable to plaintiff's distinction on the basis of the method of approval, with the result that plaintiff's attempt to distinguish these cases on both grounds should fail.

Metropolitan Stadium other than professional sports have been limited, groups as diverse as recovered alcoholics, the police federation, and rock fans have taken advantage of the existing facility. Improved facilities will undoubtedly increase the use by diverse nonprofessional sports users. Plaintiff's attempt to distinguish the present case and *R. E. Short Co. v. City of Minneapolis, supra,* is misplaced because economic development is not the primary purpose of building a new stadium; it is rather entertainment and recreation purposes which predominate. Nonetheless, a stadium will provide temporary and permanent jobs as well as some benefits to businesses in the area.

We are not persuaded by plaintiff's argument that the law is a bad law because it benefits indirectly some private individuals or corporations; that it is economically unsound; that stadia all over the country have experienced cost overruns; and that the new stadium, if built, will prove to be a "loser" from a revenue standpoint. These arguments are proper arguments to be made to the legislature, or to the Commission itself. It might very well prove to be the case that the revenues from a new stadium, from the admissions tax and from the 2 percent tax on liquor, will be insufficient to pay for both bond principal and interest and for the operations and administrative expenses. But this is a gamble that the bond holders will have to be prepared to take. Decisions such as these are economic matters and political decisions to be made by legislative bodies, not the courts.

■ (3) Plaintiff's contentions regarding the taxing district set up by the Act do not convince us that the Act is unconstitutional. The district court correctly concluded that the metropolitan area was a proper taxing district. See, *City of Burnsville v. Onischuk,* 301 Minn. 137, 222 N.W.2d 523 (1974), appeal dismissed, 420 U.S. 916, 95 S.Ct.

1109, 43 L.Ed.2d 388 (1975). Plaintiff's argument that a statewide project must be funded by a statewide tax may be valid, but in this case the district court found that outstate benefits would be minimal relative to metropolitan area benefits, cf., *Steiner v. Sullivan,* 74 Minn. 498, 77 N.W.2d 286 (1898). This finding is amply supported in the record. The legislative determination that the benefits would be primarily metropolitan permitted the imposition of the tax wholly within the metropolitan area.

■■ (4) The trial court was, however, incorrect in holding that New Prague, Rockford, and Hanover could not be constitutionally excluded from the taxing district created by the Act. There is no requirement that a special taxing district be identical to existing political subdivisions. *Maltby v. Tautges,* 50 Minn. 248, 52 N.W.2d 858 (1892). The legislature has discretion in classifying taxpayers and this determination will not be declared invalid if a reasonable ground exists. See, e. g., *In re Cold Spring Granite Co.,* 271 Minn. 460, 136 N.W.2d 782 (1965); *Hassler v. Engberg,* 233 Minn. 487, 48 N.W.2d 343 (1951).

■ Under the circumstances of this case we find the exclusion a reasonable exercise of legislative discretion. If the legislature had not excluded the portions of the three cities within the traditional metropolitan area, competitors within the same cities would have borne unequal burdens. In either case, some inequality of burden was inevitable. In a situation such as the present one, where absolute equality cannot be obtained,[7] the legislature's determination should stand if there is a reasonable basis for its choice. Because we find the exclusion reasonable, we conclude that the taxing district is constitutionally permitted.[8]

(5) The remaining issue in this case is whether a public debt for internal improvements is created requiring a three-fifths vote of the legislature for its passage.

7. See, *State ex rel. Smith v. Cronkhite,* 28 Minn. 197, 200, 9 N.W. 681 (1881); *Visina v. Freeman, supra.*

8. Minn.Const. art. 10, § 1, which provides that "[t]axes shall be uniform on the same class of subjects" is no more restrictive than the equal protection clause of the Fourteenth Amendment to the United States Constitution. *Stoltzman v. County of Ramsey,* Minn., 251 N.W.2d 130 (1977).

The district court ruled that the Act was unconstitutional because it failed to meet the requirements of Minn.Const. art. 11, § 5(a), which provides:

"Sec. 5. Public debt may be contracted and works of internal improvements carried on for the following purposes:

"(a) to acquire and to better public land and buildings and other public improvements of a capital nature and to provide money to be appropriated or loaned to any agency or political subdivision of the state for such purposes if the law authorizing the debt is adopted by the vote of at least three fifths of the members of each house of the legislature;"

Minn.Const. art. 11, § 4, provides:

"Sec. 4. The state may contract public debts for which its full faith, credit and taxing powers may be pledged at the times and in the manner authorized by law, but only for the purposes and subject to the conditions stated in section 5. Public debt includes any obligation payable directly in whole or in part from a tax of state wide application on any class of property, income, transaction or privilege, but does not include any obligation which is payable from revenues other than taxes."

Defendants challenge the district court's conclusion on the ground that no public debt, within the meaning of Minn.Const. art. 11, § 4, was created. The Council contends that neither it nor the Commission is a state agency and thus that the constitutional prohibitions do not apply.

■ It is well settled that the public debt and internal improvement provisions of the constitution apply only to the state, and not to its political subdivisions. *Davidson v. County of Ramsey*, 18 Minn. 482 (Gil. 432) (1872); *Minnesota Housing Finance Agency v. Hatfield*, 297 Minn. 155, 164, 210 N.W.2d 298, 303 (1973). This conclusion was conceded by plaintiff in the district court; the district court expressly concluded that the above provisions applied only to the state and not to its political subdivisions.

■ The district court further correctly concluded that the Council was a political subdivision of the state. See, *City of New Brighton v. Metropolitan Council*, 306 Minn. 425, 428, 237 N.W.2d 620, 623 (1975). Plaintiff has never contended that the Council was a state agency, but conceded it to be a political subdivision. Thus, the bases of the district court's ruling on this issue are its conclusions 10 and 11:

"10. The Metropolitan Sports Facilities Commission is an agency of the state and is not a political subdivision.

"11. Laws 1977, Chapter 89, creating the Commission, a state agency whose purpose is a work of internal improvement and is financed by a two percent supplemental increased sales tax of less than state-wide jurisdiction, creates public debt and therefore violates Minnesota Constitution, Article XI, Section 5(a), which requires all laws which create public debt be passed by a three-fifths vote by the House of Representatives and the Senate."

Defendants challenge these conclusions on three grounds: (1) the bonds are issued by the Council which is concededly not a state agency; (2) the Commission is not a state agency; and (3) no public debt was created within the meaning of the constitution.

■ The Commission first argues that its status is irrelevant to this issue because the tax is imposed by and the bonds are issued by the Council, a political subdivision of the state. *City of New Brighton v. Metropolitan Council, supra.* The only debt which is authorized is the issuance and sale of bonds and revenue anticipation certificates by the Council. The bonds are not a general obligation of any governmental entity and the full faith and credit of the state is not pledged to their repayment. Minn.St. 473.581, subd. 2. Thus, the requirements of a three-fifths vote for a work of public improvement does not apply to these bonds. We find this argument persuasive and dispositive of the issue.

The district court apparently concluded that the Council's issuance of the bonds was a subterfuge and that the Commission,

which it found to be a state agency, was issuing the bonds and was thereby creating a public debt requiring a three-fifths vote of the legislature. We find no basis whatever in the record for a finding of a subterfuge. Because we have found that it is the Metropolitan Council which supervises the activity of the Metropolitan Sports Facilities Commission and would issue the bonds and because we agree with the district court's determination that a stadium is a project of primarily metropolitan significance, we need not determine whether the Commission is a state agency or a political subdivision of the state of Minnesota.[9]

While we take cognizance of plaintiff's argument that the legislature could set a dangerous precedent by setting up various boards and commissions, we find these fears not justified in this case for the Commission is subject to Council review under Minn.St. 473.163 and 473.595. Further, the Council may not issue bonds pursuant to Minn.St. 473.581 until it determines that 11 conditions have been met, Minn.St. 473.581, subd. 3(a) to 3(k). This review includes determination that revenues will be sufficient to pay debt service on the bonds.[10]

In the district court plaintiff argued that the creation of public debt by a tax of less than statewide application violated Minn. Const. art. 11, § 4. This argument, however, mistakes the constitutional definition of public debt for a prescription. Plaintiff's contention that in the present case a public debt is funded by a tax of less than statewide application is correct only if "public debt" is used in a sense different from that in art. 11, § 4.

Defendants argue that no public debt is created precisely because the bonds to be issued by the Council are funded solely by revenues and a tax of less than statewide application. This court has long held that no public debt, within the meaning of the constitution, is created by the issuance of bonds paid solely by revenues. *Minnesota Housing Finance Agency v. Hatfield, supra.* The literal language of Minn.Const. art. 11, § 4, would not seem to exclude the bonds issued by the Council from the definition of public debt as argued by defendants because public debt "includes" *but is not limited to* obligations payable wholly or in part from statewide taxes. On the other hand they are not excluded as payable *solely* from non-tax revenues.

The bonds authorized by the Act are, however, more closely related to revenue bonds than to general obligation bonds. The bonds are to be paid primarily from the revenues generated by the new facility and the admission "tax" imposed; the sales tax is a backup only and applies only to a limited area of the state. The bonds are not general obligations of any political subdivision or of the state. If the bonds were general state obligations or if they were financed by a tax of statewide application, their issuance would clearly have required a three-fifths vote of each house of the legislature. Because the bonds authorized by the Act are primarily revenue bonds and because no state obligation is incurred, no public debt is created within the meaning of art. 11, § 4.[11]

Because we find that L.1977, c. 89, is a constitutional exercise of spending and taxing authority, the district court must be reversed.

9. We note that the Commission is not primarily a regulatory body and exists in large part to operate the major metropolitan sports facilities. These are not indicia of state agency status. While we are concerned about the necessity for the appointment of such a large number of outstate members, this requirement may reasonably be explained by the need for some disinterest and objectivity in the Commission's initial task of site selection.

10. Our doubt on this issue would be greater if the state had not left the Council with the ultimate discretion to determine compliance

with all the conditions for bond issuance. Although it must issue the bonds on compliance, it must determine that compliance. If the legislature had made the Council or Commission a mere conduit for state appropriations, or if the state had retained control over the operations of the Commission, the argument that the state was a party to a work of internal improvement would have greater force.

11. The state could not now issue general obligation bonds for construction of the stadium without creating a public debt.