## The Bridgeport Taxpayers Association *v.* City of Bridgeport et al.

Superior Court      Fairfield County      File No. 123661
AT Bridgeport

Memorandum filed August 11, 1965

*Marsh, Day & Calhoun,* of Bridgeport, for the plaintiff.

*Hugh C. Curran* and *John J. McGuinness,* of Bridgeport, for defendants city of Bridgeport, Samuel J. Tedesco, Vincent M. Simko, Thomas A. Mulligan, Jacob T. Olinsky, Charles F. Dowd, William E. Mullane, Michael J. D'Andrea and Richard A. Miron.

*Relihan & Irwin,* of Bridgeport, for defendants Peter A. LaPorta, Rufus P. Cushman, Arthur Clifford, John P. Flanagan, John J. Kirby and Joseph M. Dearborn.

*Garvey, Colleran & Weiner,* of New Haven, for Thomas J. Amatruda, Joseph A. Amatruda, Louis Fusco, Edmund J. Fusco and The Fusco-Amatruda Company.

*Hyman G. Etkind,* of Bridgeport, for defendant Leonard Meyers.

*Fain & Sackett,* of Bridgeport, for defendant Central Bridgeport Development Corporation.

GAFFNEY, J. This action was instituted by a voluntary association of businessmen and taxpayers of the city of Bridgeport who call themselves the Bridgeport Taxpayers Association. As appears from affidavits filed by the plaintiffs, at least two of them are officers of a downtown Main Street jewelry store. Other members of this voluntary group are unknown to the court. The association seeks to enjoin the construction of a public parking garage in the redevelopment project known as the State Street Urban Renewal Area, Conn. R-37. The area where it is proposed to construct this garage is in a central district of the city and is called Lafayette Plaza. This area is close by the Main Street where the known members of the plaintiff association conduct their business.

The complaint is drafted in five counts and petitions for (1) an injunction restraining the defendant city of Bridgeport and the defendant parking authority from purchasing or receiving land from the redevelopment agency for the purpose of erecting the proposed garage in Lafayette Plaza in the redevelopment project, and from conveying the same to the defendant developers for such purpose; (2)

an injunction restraining the city of Bridgeport from issuing bonds to finance the construction of the proposed parking garage in Lafayette Plaza; (3) an injunction restraining the mayor of the city of Bridgeport and the treasurer and the comptroller of Bridgeport from signing any bonds the proceeds of which are to be used for the construction of the proposed garage; (4) an injunction restraining the defendants city of Bridgeport, parking authority and redevelopment agency from leasing directly or indirectly to a private corporation, partnership or individual, land in the State Street project that is to be publicly owned; (5) an injunction restraining the redevelopment agency from conveying land in the State Street project to the parking authority for the purpose of leasing or subleasing by the parking authority to a private individual, corporation or partnership; (6) an injunction restraining all defendants from entering into a sale or lease of said proposed parking garage or the land upon which it would stand for any amount less than the value of said property; (7) an injunction restraining all defendants from constructing the garage in Lafayette Plaza under what it claims is a modified plan; and finally, such other relief as may pertain.

The five counts, on proof of which the plaintiff bases its claimed right to the injunctive relief sought, are summarized as follows: Count No. 1— No land was to be acquired for public use except three small parcels to be used for a right of way; the plan provides for a privately owned parking garage, privately financed; the original plan was modified by the redevelopment agency to provide for public ownership and financing of said parking garage; it was further modified to provide for a commercial rather than a transient housing use of parcel 3; the plan was changed to provide for the closing of Liberty Street and the bridging of State

Street, thereby integrating three parcels of the plan; the redevelopment agency plans to lease the proposed garage to private parties, thus exempting the land from the tax rolls; the plan does not provide for the carrying of the tax burden by the lessees of the garage; the claimed modified plan changes the earlier plan; the claimed modified plan was not approved in the manner provided by statute, and the building of the garage will adversely affect the value of the plaintiff's properties. The second count claims that the benefit from the garage will accrue to Macy's and Sears Roebuck; that the parking garage is not a public use; that it amounts to a grant of special privilege to private interests, and that the construction plan is unconstitutional and the bonds issued thereon invalid. The third count states that the claimed modification of the plan designates the garage as a use for public purposes, and hence it cannot be leased to a private person or corporation. The fourth count alleges that the required notice of the meeting to approve the bonds to finance the garage was not given by the parking authority; that the question of the issuance of the bonds was not referred to the financial advisory committee, as required by the charter of the city, prior to the April 5 vote of approval of the parking authority proposal by the common council; and that because of the failure to comply with statutory and charter requirements the actions of the parking authority and the council were invalid and illegal. The fifth count alleges that the consideration to be paid for the portion of land to be used for the garage is less than the land use value of the property.

It is clear that the entire thrust of the complaint is aimed at staving off the construction of the garage facility proposed to be built in the Lafayette Plaza area. All the asserted illegal, discriminatory, invalid and unconstitutional acts stem from the various

steps taken by the public agencies to bring about the garage construction.

This complaint the defendants have answered, denying all the essential allegations contained in it. Simultaneously, and under the rules of the court (Practice Book § 297 and following sections), they have moved for a summary judgment in their favor, claiming that no genuine issue of fact has been raised in the complaint. In furtherance of their motions, supporting affidavits have been filed. The plaintiff in turn moved for the taking of extensive depositions, which motion, if granted, would have postponed a decision in this case for months, if not years. The court denied the motion. The plaintiff then, proceeding under the rules, filed counter affidavits in opposition to the defendants' motion, the purport of which were that there are questions of fact to be determined and consequently summary judgment should not issue. In its brief, it asks in the alternative that if the court concludes that there are no issues of fact in the case, it find that there are questions of law involved and that such questions of law should be tested.

The court has examined both the affidavits and the counter affidavits and does conclude that there is no genuine issue of fact in the case. The examination further discloses that there are three basic questions involved: (A) Could this garage be constructed in the redevelopment area? (B) Did the city have authority to issue bonds to construct and finance the garage? (C) Were the procedures followed by the agencies of the city proper? The answer to all three of these questions must be in the affirmative.

The affidavits filed by the defendants in support of their motions for summary judgment are determinative of the questions. It is clear therefrom that the redevelopment agency, in a legal and proper

manner, designated a central portion of the city as the State Street Urban Renewal Area, Conn. R-37, commonly known as Lafayette Plaza. After a public hearing December 19, 1961, the plan was approved by the redevelopment agency on January 12, 1962, and by the common council of the city of Bridgeport on January 15, 1962. The plan as adopted provided for four uses of the property: (1) multifamily apartment buildings; (2) two separate commercial uses; and (3) a transient housing use (motel with or without restaurant and meeting rooms). The design of the whole plan is clearly that of a commercial use. In both commercial uses I and II, parking facilities are permitted. In the section of the plan covering off-street parking regulations for areas to be acquired for redevelopment, it is provided that as regards department stores in commercial use No. I, there shall be one space for every 400 square feet of building floor area. A further provision is that parking spaces for department stores must be provided in a parking structure.

The key to the success of a redevelopment project is the inducement by the developer of prime tenancies by either local or out-of-town stores. Manifestly, no merchant would be remotely interested in the project without the necessary parking facilities. This contingency was foreseen in adopting the provisions of the plan covering the parking facilities. It necessarily follows that from the requirements of the plan itself a parking garage has to be erected in the redevelopment area if department stores are to be located therein. This seems to be a complete answer to question (A).

The answer to question (B) is settled by referring to the case of *Barnes* v. *New Haven*, 140 Conn. 8. An almost identical situation prevailed in that case. That was a taxpayer's action (as is this) seeking

injunctive relief (as does this) to restrain the building by the New Haven parking authority of a public garage (as is the case here in the proposed garage construction by the Bridgeport parking authority). The provisions of the special acts creating the New Haven and the Bridgeport parking authorities are similar in almost every respect. So are the powers given the respective parking authorities. In both the New Haven act, Special Act No. 473, approved July 10, 1951; 26 Spec. Laws 339; ˙and the Bridgeport act, Special Act No. 560, approved on the same date; 26 Spec. Laws 419; there is a provision that the parking authority has the power to lease parking facilities to any individual, firm or corporation as the public interest may warrant. The city authorities in each act, the board of aldermen in New Haven and the common council in Bridgeport, are empowered to issue bonds to finance the parking facilities.

Our Supreme Court, in upholding the right of the New Haven parking authority to build and lease the garage, reached the following conclusions, all pertinent and all direct answers to the legal assertions in the plaintiff's complaint: "It further intends to operate the facilities as a business, either directly, exacting fees and other special charges therefor, or indirectly, under lease or contract for their operation by others. . . . On the basis of logic and common sense, fortified by these authorities, we conclude that the parking project provided for by Special Act No. 473 is a legitimate public purpose. . . . That the authority's operation of its parking facilities may involve some incidental loss to private competitors constitutes no reason for holding that the act does not meet a legitimate public purpose. It is no constitutional objection to a statute which provides for the development of parking facilities, 'nor does it derogate from the public character of its objective, that the Authority will to some extent

conduct what may heretofore have been regarded
as a private enterprise; to hold otherwise would
mean that the State would be powerless, within con-
stitutional limitations, to act in order to preserve
the health and safety of its people even though such
action were imperative and vital for the purpose.'
*McSorley* v. *Fitzgerald,* 359 Pa. 264, 270 . . . ; see
*Poole* v. *Kankakee,* 406 Ill. 521, 529 . . . . Whether
such competition as may prove incidental to the
authority's operations occurs in the daytime or the
nighttime is immaterial. Nor does the possibility
that the act may prove of greater benefit to store
owners in the shopping district than to some other
residents of the city render it invalid as discrimi-
natory, any more than would the outlay of public
funds to pave a particular section of street, with its
greater benefit to the immediate abutters than to
others. *Brodhead* v. *Denver,* 126 Colo. 119, 125
. . . . That the parking project provided for by the
act is a legitimate public purpose affords full answer
to certain other incidental claims advanced by the
plaintiff. The exemption from taxation within the
state of bonds issued pursuant to the act is in its
effect the equivalent of an expenditure of public
funds. Therefore, the amount so lost in taxes no
more affects the validity of the act than would the
expenditure of a like amount of public funds there-
under. Since the development and operation of park-
ing facilities is a proper municipal function devoted
to a public purpose, public property of all kinds, as
well as public funds in the manner provided in the
act, may be used for the purpose. *Cleveland* v.
*Detroit,* 324 Mich. 527, 539 . . . . Again, the leasing
of a parking facility by the authority to another to
operate would not be inconsistent with the public
character of the facility, since the fact that such
private lessee may gain thereby is merely incidental
to the public purpose of operating it for the use of

the public. *Poole* v. *Kankakee* . . . [supra]. It remains only to determine the meaning of the procedural restriction in § 2 of the act. As already stated, this provides that no action of the authority 'shall be valid unless authorized by a vote of the majority of its members taken at a meeting open to the public.' While this language does not mean that the authority cannot meet in executive session from which the public is excluded to consider and discuss any matters incident to the performance of its duties, it does require that, whenever effective action by the authority involves a formal vote, such vote must be taken 'at a meeting open to the public.' The words quoted call for a meeting held after reasonable notice given through the press or other local news medium, in a public place where members of the public may attend and observe the action taken by those functioning as members of the authority. It does not entitle any member of the public to participate at such meetings or to be heard unless the authority sees fit to invite participation by the public or to conduct a public hearing on a given matter under consideration. No vote taken shall be valid unless a majority of the members of the authority cast their votes in favor of it." *Barnes* v. *New Haven,* supra, 13, 17-20. Thus, this case resolves the principal claims of law in the plaintiff's complaint in favor of the defendants. The city had the authority to issue bonds to construct and finance the garage.

The remaining question was whether the city agencies took the proper procedural steps, culminating in the final vote of the common council authorizing the issuance of bonds to finance the construction of the garage. The affidavit of Peter A. Laporta as secretary of the redevelopment commission is proof of the fact, since it is uncontroverted, that a duly called meeting of the agency was held, that a quorum was present, and that the commission passed the

resolution making land available in the redevelopment area for a parking garage. The meeting of the financial advisory committee and the resolution adopted unanimously at that meeting, March 5, 1965, were proper and in order. The meeting of the planning commission unanimously adopting a resolution recommending to the common council the construction of the garage was procedurally proper. The April 5 meeting of the parking authority at which a resolution was adopted to provide financing for the construction of the garage by the issuance and sale of bonds by the city is challenged on the ground that there was insufficient notice of the meeting and that it was in effect a secret meeting not open to the public, yet this meeting was noticed three days before in the Bridgeport Post and one day before in the Bridgeport Sunday Post. The meeting was open to the public despite what the thoughts of the telephone message of plaintiff's affiant, Harold Bassett, were. At this meeting there was a newspaper reporter present. The meeting of the common council of the city held April 5, at which meeting the issuance of bonds in the sum of $3,500,000 for the construction of the garage was authorized, was properly noticed, held, and conducted. Except for the claim of lack of sufficient notice and closed hearing in relation to the parking authority meeting on the morning of April 5, the propriety of the procedural steps taken by the various city agencies has not been controverted by any counter affidavits of the plaintiff. There is no factual issue at stake here.

Great stress has been laid by the plaintiff on the claim that the original redevelopment plan has been modified. The plan and the uses under it have been previously discussed. Quite obviously, the plan in the main is commercial in character. The planning commission, in its resolution to the common council urging the construction of the public garage as a

vital element of the plan, detailed the fact that the development would be comprised of two major department stores, a two-story shopping mall, and a multistory office building. The building of the garage is a necessary adjunct to the furtherance of the commercial character of the plan as originally conceived and designed. The plaintiff claims that a commercial use is being adopted in lieu of an original transient housing use. Transient housing is defined in the plan as "motels with or without restaurant and public meeting rooms." This is patently a commercial use. The closing of Liberty Street and the bridging of State Street in no way can be considered as of consequence in any claimed change. Even if there were a modification in the original plan, there is express authority given in the statutes permitting the redevelopment agency to make such a modification unless the change is substantial. General Statutes § 8-136. The finding of the court is that there has been no substantial modification in the plan. Section 8-142 of the General Statutes provides as follows: "Any urban renewal project undertaken pursuant to section 8-141 shall be undertaken in accordance with an urban renewal plan for the area of the project. As used in this part, an urban renewal plan means a plan, as it exists *from time to time,* for an urban renewal project, which plan (1) shall conform to the general plan for the municipality as a whole; and (2) *shall be sufficiently complete* to indicate such land acquisition, demolition and removal of structures, redevelopment, improvements and rehabilitation as may be proposed to be carried out in the area of the urban renewal project, zoning and planning changes, if any, land uses, maximum densities, building requirements and the plan's relationship to definite local objectives respecting appropriate land uses, improved traffic, public transportation, public util-

ities, recreational and community facilities and other public improvements. An urban renewal plan shall be prepared and approved pursuant to the same procedure as provided in this chapter with respect to a redevelopment plan." (Italics supplied.) The redevelopment agency acted with clear authority under this section of the statutes.

The argument advanced by the plaintiff that in the original plan only three small parcels were to be devoted to a public use is groundless. The maps which are a part of the plan indicate many more parcels to be used for public facilities. If a strict interpretation were given the claim that, other than the three small parcels of land, no land would be used for public facilities, it would mean that streets could not be widened, that the Lafayette esplanade could not be built, and that the traffic circulation pattern at the northern end of the project could not be changed. (This work has already been completed, as has the work on the esplanades). The fact is that the three small parcels in question have been acquired for the purpose of conveying them to the state highway department.

The plaintiff's complaint about a lease being negotiated with private parties is premature and anticipatory. No such lease has been entered into or is in existence. Whether or not such an eventuality will ever take place cannot at the moment be stated with any certainty. Respecting the claim that the consideration to be paid for the land is less than the use value of the property, suffice to say that it is a bookkeeping transaction, that the redevelopment agency is merely carrying out a statutory duty in establishing such a price for the land, and that the housing and home finance agency, which agency of the United States government is supplying three-fourths of the money for the redevelopment projects

in Bridgeport, concurs with the action of the redevelopment agency and approves the bookkeeping price established. There has been nothing shown by counter affidavit to prove the allegation that there is a grant of special privilege to private interest. It is merely a bald, unsupported assertion in the complaint.

The plaintiff in its complaint, with all the sweeping assertions contained therein, takes aim at the very heart of the entire Lafayette Plaza redevelopment plan. Enjoining the construction of the parking garage would doom the whole project to inevitable failure. Despite the broadside attack made by the plaintiff, the court is of the opinion that there is no genuine factual issue in the case, nor is there a bona fide legal issue the answer to which has not already been spelled out in the case of *Barnes* v. *New Haven,* 140 Conn. 8, the charter of the city of Bridgeport, and the statutes of the state of Connecticut.

Judgment may enter for the defendants.