R. E. SHORT COMPANY, et
al., Respondents,

v.

CITY OF MINNEAPOLIS, et
al., Appellants.

R. E. SHORT COMPANY, et
al., Respondents,

v.

MART PLAZA HOTEL, INC., Appellant.

Nos. 48624, 48625.

Supreme Court of Minnesota.

Order Filed March 28, 1978.

Opinion June 16, 1978.

333

Walter Duffy, Jr., City Atty., Ronald H. Linman, Asst. City Atty., Minneapolis, for City of Mpls., et al. and Hofstede.

Leonard, Street & Deinard and Morris Sherman, Minneapolis, for Mart Plaza Hotel.

William P. Dinan, City Atty., Daniel C. Berglund, Asst. City Atty., Duluth, for City of Duluth, amicus.

George R. Johnson and Ralph W. Peterson, Johnson & Eastlund, Minneapolis, for respondents.

## ORDER

OTIS, Justice.

1. This matter came on for an expedited hearing before this court sitting en banc on March 24, 1978, upon the appeal by the city of Minneapolis and Mart Plaza Hotel, Inc., pursuant to Rule 103.03, Rules of Civil Appellate Procedure, from a judgment and order of the Hennepin County District Court dated February 16, 1978.

2. Appellants seek reversal of the order permanently enjoining and restraining them from "implementing or in any manner carrying out the parking facility agreement, the management agreement, and the option agreement contained in the contract entitled 'Contract for the Lease and Development of Certain Land in Development District No. 51 (Loring Park)'" which had been negotiated between the city of Minneapolis and Mart Plaza Hotel, Inc., and approved by the Minneapolis City Council and

Albert Hofstede, Mayor of the city of Minneapolis.

3. After carefully reviewing the evidence before us and the oral presentations of counsel, we are persuaded that the trial court erred in permanently enjoining and restraining appellants from implementing the challenged agreements, and we hold:

(a) That the management agreement was not subject to the competitive bidding requirements of Minn.St. 471.345;

(b) That L.1971, c. 677, rather than Minn.St. c. 472A, governs the procedure to be followed by the city of Minneapolis in approving contracts for the development of disposition parcels within the Loring Park Development District; and

(c) That we can find no basis to interfere with the decision of the Minneapolis City Council that the construction of the hotel/mart and parking ramp complex supports a public purpose.

THEREFORE, IT IS HEREBY ORDERED, that the judgment is reversed and the permanent injunction is dissolved.

A formal opinion will follow.

SHERAN, C. J., took no part in the consideration or decision of this case.

Considered and decided by the court en banc.

ROGOSHESKE, Justice.

This is an appeal from a judgment of the district court permanently enjoining and restraining appellants from implementing the parking-facility agreement, the management agreement, and the option agreement contained in the contract entitled "Contract for the Lease and Development of Certain Land in Development District No. 51 (Loring Park)." The contract had been negotiated between the city of Minneapolis and Mart Plaza Hotel, Inc. (developer), and approved by the Minneapolis City Council (city council). Because we believe that we should not interfere with the determination by the city council that this contract serves a public purpose and because the city com-

**334**

plied with all applicable statutes, we reverse the trial court in all respects.

In 1971, the legislature enacted L.1971, c. 677, which authorized the cities of Minneapolis and Robbinsdale to create development districts, to issue general obligation bonds to carry out development programs, and to utilize tax-increment financing to pay off the interest and principal on such bonds. In 1974, L.1971, c. 677, § 2, was amended to permit the city of Minneapolis to acquire land or easements by eminent domain. L.1974, c. 357, § 2.

During the same session the legislature also enacted L.1974, c. 485, codified as Minn.St. c. 472A, which authorized other municipalities to create development districts and to utilize tax-increment financing for urban redevelopment. The statement of purpose in § 472A.01 is similar to that delineated in L.1971, c. 677, § 1, and the major differences between the two acts are the procedural steps required under § 472A.07 when a development district is being established. In order not to interfere with existing development, the legislature included a savings clause, § 472A.13.[1]

The purpose of tax-increment financing of urban redevelopment is to create economically productive property where none presently exists by providing inducements to private commercial development. The municipality, either with or without the power of eminent domain, acquires all the property in an area in which the value of real estate is declining or there is a high proportion of underutilized or tax-delinquent land. Pursuant to a development plan for the area, the municipality then delineates a number of new disposition parcels which it markets to private developers. Inducements to such private development include promises to construct certain support facilities or various other types of incentives affording substantial savings to the developer. Once the land becomes pro-

ductive, the increment over the prior tax revenues is utilized to pay off the interest and principal on the bonds issued to finance the redevelopment, and the municipality retains in its general treasury the amount equal to the former tax revenue from the area. After the bonds are paid off, the area is expected to remain economically productive, providing substantially increased tax revenues for municipal government.

This philosophy of development financing underlays the decision to create the Loring Park Development District just south of downtown Minneapolis. Acting pursuant to L.1971, c. 677, the city council established this district by a resolution dated June 9, 1972. At that time, there were 58 privately owned land parcels, many of which were economically unproductive. The goal of the Loring Park Development District was to renew the area by the private construction of additional residential units, convention and hotel facilities, and various other commercial enterprises. The city also planned to upgrade the public works and beautify the district by constructing the Loring Greenway. All of this development, the city council determined, would provide not only employment during the construction phase of the project but also additional permanent employment, increased tax revenues, and a more productive tax base for the district and the city. In April 1973, the city held the first of four bond sales, and in August it began acquisition of the land, first by purchase and, after April 1974, by eminent domain proceedings. The district was then replatted into 14 disposition parcels which were to be offered to developers willing to construct structures that would conform to the alternative land uses outlined in the development program.

The Loring Park Housing Interim Report, adopted by the city council as a development program, was a very general state-

1. Minn.St. 472A.13 reads in pertinent part as follows: "This law does not affect any project or program using tax increment financing which was approved by a city council under Laws 1971, [c. 677] prior to July 1, 1974 and such projects or programs may be completed

and financed in accordance with the provisions of the laws under which they were initiated * * *. Provided, however, that Laws 1971, [c. 677 is] hereby specifically superseded, except as to those projects or programs which have been approved prior to July 1, 1974."

ment about possible land uses. In 1973, two other documents were written to supplement the interim report. The Loring Park Development Urban Design Plan mentioned a hotel with convention facilities and a parking ramp as one alternative use for disposition parcels 2D and 2E. Simultaneously with the urban-design plan, the Economic Market Study Loring Park Development District was prepared to determine the financial feasibility of the contemplated physical improvements. This report considered the potential for hotel development as well as the market for new housing units and suggested that the income from the development district would be slightly higher if more residential units and fewer hotel rooms were constructed.

By July 1, 1974, the cutoff date for the operation of the savings clause of c. 472A, only 16 of the 58 parcels within Loring Park had been acquired, primarily because the power of eminent domain had not been conferred until April 1974. Because the city's legal counsel advised it that the new statute did not govern already existing development districts which had prepared development plans, the city continued to conform its program for Loring Park to the requirements of L.1971, c. 677.

In June 1974, the city sent out Invitations for Development Proposals. In September 1974, Letoh Associates responded by proposing to construct a hotel on parcel 2D if the city were willing to build a 750-car, public parking ramp on parcel 2E. The city commissioned Laventhol & Horwath to evaluate this proposal. Their report to the city council noted that, although it might be financially superior to have residential development of these parcels, substantial benefits would accrue from the construction of a hotel and that the Letoh proposal was consistent with the overall objectives of Loring Park. The report also discussed the need

for cooperation between the city and the developer in arranging financing for such a project and the fact that municipal construction of a parking ramp could serve as an incentive for hotel development. Despite the generally favorable evaluation, no contract materialized.

In 1976, Convention Hotel Associates, the predecessor of appellant Mart Plaza Hotel, Inc., proposed to construct a hotel and trade mart on parcel 2D if the city would build a 750-car, public parking ramp on parcel 2E. In October 1976, the city council issued to it a letter of intent, which was renewed in July 1977. The proposal and the development contract were discussed in two city council committees in December 1977, and the contract was unanimously approved by the council on December 16, 1977. After Mayor Stenvig vetoed this resolution, all interested parties were permitted to present their positions on the proposal to the full city council.[2] The council then weighed the testimony and overrode the veto on December 30, 1977.

Among its terms the contract provided that the city would construct a public parking facility, the lower level of which would be rented by the developer for use as a convention hall. The city also agreed to design the parking ramp to be compatible with the hotel and to ensure that tennis facilities for hotel guests could be erected by the developer on its roof. Another part of the contract contained a management agreement under which the developer was to manage the parking ramp for a term of 20 years, and the developer was granted a 50-year exclusive option to purchase the parking ramp and convention hall. The city, however, retained exclusive control over the ramp. The rates, hours, and methods of operation were to be set by the city, and the hotel, the trade mart, and their

2. Respondents were among the parties who took advantage of this opportunity. One of the respondents explained to the city council that, in his view, this development contract did not serve the purpose of tax-increment financing because the income the city would receive would not be sufficient to pay off its investment in the project. He argued that, rather than using the land for a hotel, which would return very low tax revenues, it should be put into residential redevelopment. He then offered to purchase parcels 2D and 2E for $500,-000 in cash and to construct $10 million worth of condominiums or townhouses which, he claimed, would generate more than the capital investment plus interest on the bonds.

customers would receive no preferential treatment. All income from the ramp would go directly to the city, and the entire agreement could be canceled by the city if the developer did not perform in a satisfactory manner. Finally, the ramp and the land upon which it would be constructed were in no way made subordinate to the mortgage that the developer secured to finance the construction of the hotel.

At the time this contract was approved by the city council, the city had sold approximately $24 million in bonds to finance land acquisition, relocation, and public improvements within Loring Park. Three private developments had also already begun—the 330-unit condominium development at Twelfth and Nicollet called 1200 On the Mall, the Fine & Harris Greenway Gables townhouse development on parcels 2A and 2B, and the 306-unit Nicollet Towers housing project on parcel 2F. Letters of intent had also been issued by the city council for parcels 1A, 1E, 2C, 2F, and 2G.

On January 5, 1978, respondents, as taxpayers, commenced this lawsuit to challenge the city's proposed use of replatted parcels 2D and 2E. They requested declaratory and injunctive relief, seeking to void the "Contract for the Lease and Development of Certain Land in Development District No. 51 (Loring Park)" and to enjoin its execution. The trial court accepted their arguments and permanently enjoined and restrained appellants from implementing the parking facility agreement, the management agreement, and the option agreement contained in the contract. Specifically, the trial court held that the parking facility agreement was void because it involved the expenditure of public funds for private purposes and because the city had failed to follow the requirements of c. 472A prior to executing the contract, that the management agreement was void because the city had awarded the management contract without complying with the competitive bidding requirements of Minn.St. 471.-345, and that the option agreement was void because it exceeded the powers conferred on the city by L.1971, c. 677. It is from the judgment of the district court that this appeal is taken.

Although the trial court held that the option to purchase the parking ramp included in the agreement was illegal and void, we do not believe that the question of its validity was properly before the court. It is clear from the record that the developer waived its option to purchase the public parking ramp. This waiver made the issue moot, despite respondents' contention that a bilateral contract could not be waived unilaterally. Thus, for the purpose of this decision we assume that no purchase agreement exists between the developer and the city under which the developer could exercise an option to purchase the public parking ramp after the expiration of its 20-year lease.

1. The major issue presented in this appeal concerns the legality of the decision by the city council that a public purpose would be served by its erection of a public parking ramp to induce a private developer to construct a hotel and trade mart complex on the adjoining property. The trial court found that this expenditure was for a private purpose. We believe that the reason the trial judge erred in reaching this conclusion was because he focused solely on the decision to construct the parking ramp rather than looking at the public benefits that would flow from the development contract for the coordinated construction of a convention hotel *and* a public parking ramp.

The public purpose doctrine which permits the expenditure of public funds only in furtherance of a public purpose is well-settled law in Minnesota. *Minnesota Housing Finance Agency v. Hatfield*, 297 Minn. 155, 210 N.W.2d 298 (1973); *City of Pipestone v. Madsen*, 287 Minn. 357, 178 N.W.2d 594 (1970); *Port Authority of City of St. Paul v. Fisher*, 275 Minn. 157, 145 N.W.2d 560 (1966); *Housing & Redevelopment Authority of St. Paul v. Greenman*, 255 Minn. 396, 96 N.W.2d 673 (1959); *Visina v. Freeman*, 252 Minn. 177, 89 N.W.2d 635 (1958); *Thomas v. Housing & Redevelopment Authority of Duluth*, 234 Minn. 221, 48 N.W.2d 175 (1951); *Erickson v. King*, 218

Minn. 98, 15 N.W.2d 201 (1944); *Behrens v. City of Minneapolis*, 199 Minn. 363, 271 N.W. 814 (1937); *Burns v. Essling*, 156 Minn. 171, 194 N.W. 404 (1923). The general contours of this doctrine are stated in *Visina v. Freeman*, 252 Minn. 184, 89 N.W.2d 643, as follows:

"1. It is well settled in this state that the state or its municipal subdivisions or agencies may expend public money only for a public purpose. What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

"2. In determining whether an act of the state constitutes a performance of a governmental function or a public purpose which will justify the expenditure of public money, a legislative declaration of public purpose is not always controlling. The determination of what is and what is not a public purpose, or the performance of a governmental function, initially is for the legislature, but in the final analysis it must rest with the courts.

"3. The mere fact that some private interest may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public. The rule is clearly stated in *Burns v. Essling*, 156 Minn. 171, 174, 194 N.W. 404, 405, as follows:

" ' * * * [I]f the primary object of an expenditure of municipal funds is to subserve a public purpose, the expenditure is legal, although it may also involve as an incident an expenditure which, standing alone, would not be lawful. It is equally well settled that, if the primary object is to promote some private end, the expenditure is illegal, although it may incidentally serve some public purpose also.' "

Because "public purpose" is an elusive concept, whether a particular expenditure serves a public purpose requires case-by-case disposition. We have also recognized that "public purpose" should be broadly construed to comport with the changing conditions of modern life. *City of Pipestone v. Madsen, supra; Housing & Redevelopment Authority of St. Paul v. Greenman, supra.* Consistent with this approach, we pay great deference to the initial legislative determination that a particular project serves a public purpose, *Port Authority of City of St. Paul v. Fisher, supra,* and we presume that public officials are properly performing their duties when they make such decisions. As the Ohio Supreme Court recently stated in *State ex rel. Taft v. Campanella*, 4 Ohio O.3d 423, 426, 50 Ohio St.2d 242, 246, 364 N.E.2d 21, 24 (1977):

" 'In the absence of evidence to the contrary, public officials, administrative officers, and public authorities, within the limits of the jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully, and, it will be presumed that public authorities, in determining the advisability of constructing a public project, have considered the necessary facts and have sufficiently satisfied themselves as to the propriety and feasibility of the construction, as a predicate for the issuance of bonds or notes to pay the cost thereof.' "

This presumption necessarily makes the scope of review of such governmental decisionmaking extremely narrow, and a reviewing court should overrule a legislative determination that a particular expenditure is made for a public purpose only if that determination is manifestly arbitrary and capricious.

Such a narrow scope of review also comports with the general rule governing judicial review of municipal decisionmaking declared in *Douglas v. City of Minneapolis*, 304 Minn. 259, 272, 230 N.W.2d 577, 586 (1975):

" * * * Because of our belief that the legislature intended wide discretion to be vested in the governing body, we

have concluded that the scope of review must, of necessity, be narrow. Therefore, we hold that the district court is limited to a resolution of whether the determinations of the governing body were arbitrary, capricious, and unreasonable under all the facts and circumstances of the case. In applying this scope of review, the trial court should be guided by our statement in *Sabes v. City of Minneapolis,* 265 Minn. 166, 171, 120 N.W.2d 871, 875 (1963):

"'* * * In reviewing the proceedings of the municipality it is not the court's function to pass on the wisdom of the [payment], but only to determine whether the council exercised an honest and reasonable discretion, or whether it acted capriciously, arbitrarily, or oppressively.'

"We further hold that the burden of proving that the governing body's determination was arbitrary, capricious, and unreasonable must rest upon those contesting the municipal action, in this case the appellant taxpayers."

Thus, once the legislature authorizes tax-increment financing by a municipality, declares such financing to serve a public purpose, and enumerates the type of projects that may be so financed and that such projects will serve a public purpose, these declarations are given great weight by the courts. Furthermore, the city, in implementing the powers delegated to it by the legislature, is also vested with broad discretion in determining whether particular projects will serve a public purpose. While such decisions are reviewable, they can only be set aside if it is established that the city's action is manifestly arbitrary and capricious because the projects primarily serve a private interest.

▇ Laws 1971, c. 677, § 1, sets out the public purpose to be served by tax-increment financing of redevelopment by the city of Minneapolis:

"In mature cities such as Minneapolis * * *, it is found that there is a need for new development in areas of the city which are already built up. * * * This new development is crucial in providing employment opportunities for Minneapolis * * * citizens, in improving the tax base for the community, and in improving the general economy for the metropolitan area. Under this act, the cit[y] of Minneapolis * * * would be authorized to develop a program for improving a district of the city in such ways as * * * providing impetus for commercial development, providing increased employment, * * * providing off-street parking to serve the shoppers and employees of the district; providing open space relief within the district; and providing such other facilities as are outlined in the development program adopted by the governing body. It is hereby declared by the legislature of the state of Minnesota that the actions required to assist the implementation of such development programs are a public purpose and that the execution and financing of such programs are a public purpose."

This statement of public purpose is reiterated almost verbatim in Minn.St. 472A.01. Since the city council has determined that these purposes will be served by the developer's construction of a hotel and trade mart and that the city's construction of a public parking ramp is essential to the developer's decision to construct, under the restricted standard of review a court can only overturn the city's decision if it is found to be manifestly arbitrary and capricious.

There are numerous statutes that declare the construction of public parking ramps in Minneapolis to be in the public interest, L.1971, c. 677, § 1; Minn.St. 472A.01 and 459.14, and respondents do not challenge the construction of the ramp per se.[3] Instead, respondents contend that because the city decided to induce private commercial development of a convention hotel by constructing a public parking ramp; by leasing the ramp to the developer; by leasing the

---

**3.** Respondents do, however, challenge the procedure followed by the city in reaching this decision as not comporting with c. 472A. See, *infra.*

space below the ramp and the air rights above the ramp for conversion into convention facilities and tennis courts, respectively; and by conforming the design of the ramp to the design of the hotel to which it is attached its expenditure of public funds to construct a parking ramp is primarily for the benefit of the hotel developer and thus serves a private,[4] rather than a public, purpose.[5]

Despite the trial court's decision that the city acted improperly in attempting to induce the developer to build the hotel, inducements are routinely permitted by the courts. The legal effect of the construction of a parking ramp is no different from such inducements to commercial redevelopment as the city's sale of the land to a developer at substantially less than its cost of acquisition or its market value or the city's installation, at no cost to the developer, of such utilities as sewer and water. We have gone so far as to approve the condemnation of land by a public authority and its later sale or lease to private developers, *Housing & Redevelopment Authority of St. Paul v. Greenman,* 255 Minn. 396, 96 N.W.2d 673, and the construction of buildings by the public authority to be leased to private persons, *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594; *Port Authority of City of St. Paul v. Fisher,* 275 Minn. 157,

145 N.W.2d 560; *Visina v. Freeman,* 252 Minn. 177, 89 N.W.2d 635; *Erickson v. King,* 218 Minn. 98, 15 N.W.2d 201, as permissible inducements to lure the private sector into the redevelopment plan.[6] Whether the form of inducement used by the city—namely, the construction of a public parking ramp—is an action "required to assist the implementation of * * * development programs," L.1971, c. 677, § 1, is a determination that rests largely with the municipality under the public purpose doctrine.

The trial court also appears to have concluded that the contract terms permitting the developer to lease both the air rights above the parking ramp and the lower level, as well as those providing for structural compatibility between the ramp and the hotel, were additional evidence of the essentially private purpose of the agreement between the city and the developer. All of these ancillary agreements, however, are permissible under L.1971, c. 677, and other statutes. The city is clearly authorized to lease air rights over the public parking ramp, L.1971, c. 677, §§ 2 and 9(d); §§ 472A.03 and 472A.10(d); L.1971, c. 425, and the lower level of the parking ramp, L.1971, c. 677, §§ 2 and 9(c); §§ 472A.03 and 472A.10(c); L.1971, c. 425. Furthermore, these are both proper inducements to

4. Respondents also argue for the first time on appeal that the subordination agreement and the ground lease for the hotel parcel show the private purpose of the agreement. Whether their contention is meritorious is not properly before the court because it was not litigated below.

5. Since respondents challenge neither the legislature's authority to declare that these activities serve a public purpose nor that the activities themselves fit within the definition of public purpose, the issues presented in this case are much narrower than those covered by our previous decisions. See, e. g., *Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. 155, 210 N.W.2d 298 (1973); *Visina v. Freeman,* 252 Minn. 177, 89 N.W.2d 635 (1958). This case presents a simpler application of the public purpose doctrine than did those cases in which we approved the legislative authorization of the redevelopment of blighted areas, low-rent housing developments, and commercial developments.

6. Respondents attempt to distinguish some of these cases on the ground that they involve a different form of financing which would not create general taxpayer liability. Just such a distinction, however, was rejected recently by the Illinois Supreme Court in *People ex rel. City of Urbana v. Paley,* 68 Ill.2d 62, 73, 11 Ill.Dec. 307, 312, 368 N.E.2d 915, 920 (1977): "We might note here the attempt of the mayor to characterize as critical the distinction between general obligation bonds and revenue bonds. * * * We believe this contention to be illogical. * * * At issue in this case, * * * is not the existence of a pledge of credit, but rather the nature of the ultimate purpose for which money is spent or credit is pledged or extended. A public purpose insulates the bonds from constitutional attack, whether they be general obligation or revenue bonds." See, also, *Richards v. City of Muscatine,* 237 N.W.2d 48 (Iowa 1975), upholding tax-increment financing of urban renewal.

development and serve the additional public purpose of increasing the amount of taxes paid to the city, L.1971, c. 677, § 1; Opinion of the Justices, 109 N.H. 396, 254 A.2d 273 (1969). Similarly, the city's right to make the two structures compatible would seem to be authorized by L.1971, c. 677, § 2, but, even if it were not, it could reasonably be considered as a proper inducement to private development. Finally, L.1971, c. 677, § 9(b), gives the city the authority to make the developer manager of the public parking ramp. See, also, § 472A.10(b); *Bridgeport Taxpayers Assn. v. Bridgeport,* 26 Conn.Supp. 239, 217 A.2d 718 (Super.Ct. 1965); *Poole v. City of Kankakee,* 406 Ill. 521, 94 N.E.2d 416 (1950). Since the city is expressly authorized to enter all the agreements challenged, the mere fact that they are all with the same party cannot make them invalid.

The trial court erroneously held that the construction of a public parking ramp served primarily a private, rather than a public, purpose because it was persuaded to view the parking ramp in a vacuum. When the ramp's financing is separated from the dominant purpose of the entire development contract between the city and the developer, the benefits to the developer would appear to outweigh the public benefits and permit the court to conclude that this was an illegal expenditure of public funds. When the development contract is viewed in its entirety, however, the parking ramp becomes a necessary adjunct of a project which, according to the city council, is crucial to the success of the entire development district. Under the proper standard of review, the trial court could only have disregarded the testimony of the city's expert regarding the public benefits to be derived from the construction of the hotel and ramp complex—a $26,000,000-hotel;

$1,200,000 in taxes from land that at present generates no taxes; an increased tax base; 700 new jobs; increased liquor taxes and hotel taxes; the revitalization of Minneapolis as a convention and tourist attraction; and the assurance the Loring Park Development District would be successful—if the city's reliance on such evidence were completely unreasonable. Since respondents introduced no evidence that such was the case, the city's reliance on this evidence in approving the proposed uses for parcels 2D and 2E cannot be disregarded. These enumerated public benefits upon which the city council relied preclude a conclusion that its decision to accept the development contract was based on whim or caprice or was completely unsupported by the evidence.

Respondents attempted to demonstrate that the construction of a hotel on parcel 2D was not the best financial utilization of the property. They argued to the trial court that the construction of a hotel and ramp complex would not return sufficient tax or leasehold revenues to even pay the interest on the bonds that were sold to acquire the land and finance the construction of the ramp and that it was commercially unwise for the city to use the land for hotel rather than residential development.[7] While this testimony could very well support a finding that the development contract was unwise, under the proper standard of review, the city's failure to follow this advice is only relevant to the issue of whether the city acted in a manifestly arbitrary and capricious manner. See, *Lerner v. City of Minneapolis,* 284 Minn. 46, 55, 169 N.W.2d 380, 385 (1969). As the court noted in *People ex rel. City of Salem v. McMackin,* 53 Ill.2d 347, 358, 291 N.E.2d 807, 814 (1972):

7. One of the respondents testified that the project as a whole would not return sufficient tax revenues or leasehold revenues to even pay the interest on the $9 million of public funds that will have been invested when the city completes the parking ramp. He contended that the construction of a hotel would return the least in tax revenues because a hotel is taxed on a per-room-occupancy basis rather

than on the ad valorem value of either the land or the leasehold and that, although the leasehold of the parcel on which the hotel will be constructed, the leases of the trade market floors and the air space above the parking ramp are taxable, those tax revenues plus the rental payments made this a very bad deal for the taxpayers of the city. See, footnote 2, *supra.*

" '* * * If it can be seen that the purpose sought to be obtained is a public one and contains the elements of public benefit, the question how much benefit is thereby derived by the public is one for the Legislature, and not the courts.' " Thus, as long as it is not unreasonable for the city to conclude that the development it is approving will improve employment and increase the tax base, the degree to which it will do so and whether or not it is the best form of development are determinations left to the discretion of the governing council, which, absent proof of fraud, is presumed to be acting in the public interest. For these reasons, we hold that the trial court erred in its scrutiny of the city's decisions, thereby substituting its opinion for that of the city, which is contrary to its function in challenges to municipal decisions under the public purpose doctrine.

■ 2. Respondents also contend, and the trial court agreed, that the city's failure to comply with the provisions of c. 472A, which had replaced L.1971, c. 677, as the governing statute in 1974, voids its contract with the developer. Whether the city's decision to continue to act pursuant to L.1971, c. 677, was improper depends on the applicability of § 472A.13,[8] which exempts from the requirements of c. 472A "any project or program using tax increment financing which was approved by a city council * * prior to July 1, 1974 * * *."

Appellants argue that the city could ignore the requirements of c. 472A in determining how to utilize parcel 2E because "project or program" in § 472A.13 refers to the entire Loring Park Development District. Respondents and the trial court interpreted the terms more narrowly to include only specific projects within the district. Since the decision to construct a parking ramp was not made until after July 1, 1974, the trial court found that it was unprotected by the savings clause and that the city's failure to conform to the procedures outlined in c. 472A made the entire contract illegal and void.

Laws 1971, c. 677, § 3(b), defines development program as "a statement of objectives * * * for improvement of a development district * * *," and § 472A.02, subd. 5, is substantively identical. We are persuaded that this definition was intended by the legislature to exempt the entire development district. Other aspects of the new legislation support this conclusion.[9] Most significant, the legislature would not have amended L.1971, c. 677, to extend to Minneapolis and Robbinsdale the power of eminent domain if it intended to supersede L.1971, c. 677, with a new statute.

■ Laws 1971, c. 677, § 3(b), also requires that the development program include "a complete statement as to the public facilities to be constructed within the district * * *." Although a public parking ramp is not mentioned specifically in either the extremely general interim report or the urban-design plan which supplemented it, the ramp is consistent with the objectives of the Loring Park Development District and its inclusion in the development program can be said to be merely a refinement of the development plan. This inter-

8. By its terms, § 472A.13 applies to "Laws 1971, Chapters 548 or 677 and Laws 1973, Chapters 196, 761 and 764" which permitted the cities of Hopkins, Minneapolis and Robbinsdale, Red Wing, Duluth, and St. Paul, respectively, to establish development districts and finance development programs through tax-increment financing. Thus, after July 1, 1974, these municipalities had to follow the same procedures as all others throughout the state in approving programs or projects.

9. The language of §§ 472A.06 and 472A.07, subd. 1, suggests that the legislature contemplated only one development program for a development district. Section 472A.07, which requires that certain actions be taken before approving a tax-increment financing plan, would appear to be inapplicable because Loring Park's plan had been approved and some bonds had been issued for the district prior to July 1, 1974. Since the other requirements to which respondents refer are found in substantively identical form in L.1971, c. 677, except for § 472A.11, which requires the creation of an advisory board in cities of the first class, they are consistent with appellants' interpretation that c. 472A merely gave to all municipalities the power already conferred by L.1971, c. 677, on Minneapolis and Robbinsdale.

pretation is consistent with that taken by a Connecticut court faced with a similar challenge to the construction of a public parking ramp. In *Bridgeport Taxpayers Assn. v. Bridgeport,* 26 Conn.Supp. 239, 248, 217 A.2d 718, 723 (Super.Ct.1965), the court approved the construction of a public parking ramp, even though it was not mentioned in the original plan, because it was necessary to the uses contemplated therein:

"Great stress has been laid by the plaintiff on the claim that the original redevelopment plan has been modified. * * * Quite obviously, the plan in the main is commercial in character. * * * The building of the garage is a necessary adjunct to the furtherance of the commercial character of the plan as originally conceived and designed."

After finding the construction a necessary adjunct, the court went on to state:

" * * * Even if there were a modification in the original plan, there is express authority given in the statutes permitting the redevelopment agency to make such a modification * * *." 26 Conn.Supp. 249, 217 A.2d 723.

Since L.1971, c. 677, § 8, would appear to permit the program to be modified,[10] the decision to construct the public parking ramp is a valid modification or refinement of the original development program.

3. Finally, respondents contend, and the trial court found, that the management contract is void because the city failed to comply with the competitive bidding requirements of Minn.St. 471.345, the Uniform Municipal Contracting Law. According to that section, as amended by L.1977, c. 182, if the contract amount is estimated to exceed $10,000, it can only be let after soliciting sealed bids by public notice. § 471.345, subd. 3. The other prerequisite for the utilization of competitive bidding is that the contract involved be "an agreement entered into by a municipality for the

sale or purchase of supplies, materials, equipment or the rental thereof, or the construction, alteration, *repair or maintenance of real or personal property.*" (Italics supplied.) § 471.345, subd. 2. Respondents argue that the city should have used competitive bidding because the management contract contemplates maintenance costs in excess of $10,000, while appellants maintain that management agreements are not contracts within the meaning of the statute.

■ The reasons for requiring competitive bidding are discussed in *Coller v. City of St. Paul,* 223 Minn. 376, 387, 26 N.W.2d 835, 841 (1947):

" * * * The very purpose of requiring competitive bidding is to divest the officials having the power to let contracts of discretion in some respects and to limit its exercise in others. In the area of discretion is precisely where such abuses as fraud, favoritism, extravagance, and improvidence in connection with the letting of contracts are prevalent. * * * The purposes of requirements for competitive bidding are to prevent such abuses by eliminating opportunities for committing them and to promote honesty, economy, and aboveboard dealing in the letting of public contracts."

See, also, *Griswold v. County of Ramsey,* 242 Minn. 529, 65 N.W.2d 647 (1954). In order to ensure that municipalities comply with the statute, this court has adopted the position that "as a matter of sound public policy, such a contract is void, without any showing of actual fraud or an intent to commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding." 242 Minn. 536, 65 N.W.2d 652. Nevertheless, competitive bidding statutes are generally construed narrowly.[11] *Griswold v. County of Ramsey, supra.*

---

10. Laws 1971, c. 677, § 8, subd. 1, requires the city coordinator to report to the city council "an estimate of changes in the amounts of such costs which would follow upon the adoption of any addition or amendment to the development program recommended to or under considera-

tion by the city council."

11. The rationale for this judicial position is explained in *People ex rel. Adamowski v. Daley,* 22 Ill.App.2d 87, 91, 159 N.E.2d 18, 20 (1959): "In the absence of some statutory pro-

In light of the restrictive interpretation given by courts to competitive bidding statutes and the ease with which the legislature could have included such management agreement within the definition contained in § 471.345, subd. 2, we do not believe that the legislature intended the statute to cover this type of public contract.[12] Because we hold that the management agreement is not a "contract" for maintenance of real property within the meaning of this statute, we need not decide whether its estimated costs are in excess of $10,000.[13]

Reversed.

SHERAN, C. J., took no part in the consideration or decision of this case.

vision, competitive bidding is not an essential prerequisite to the validity of contracts by and with public bodies. 63 C.J.S. Municipal Corporations § 996, p. 568; McQuillin, Municipal Corporations, 1950, 3rd Ed., § 29.31, pp. 272–274. Furthermore, a statute requiring bids is 'restrictive' and should not be extended beyond the language used. * * *

" * * * In the absence of some express legislative direction, indicating that a contract for a concession, as is here involved, must be let by competitive bidding, this court is powerless to include it therein. * * * The presumption obtains that the actions of public officials, in the performance of their official acts, are done in good faith and with honest motives."

12. Respondents argue that because the city utilized competitive bidding in awarding other parking contracts it must do the same in this case. This argument has no validity. Once the city decides to utilize competitive bidding, it must follow all the proper procedures, *Griswold v. County of Ramsey,* 242 Minn. 529, 65 N.W.2d 647 (1954), but it need employ competitive bidding only if expressly required by statute.

13. Although the trial found this contract to be in excess of $10,000, respondents did not carry their burden on this issue. Article IV of the management agreement requires the city to perform and pay for all necessary major repairs, which would leave only minor repairs to the developer, and respondents introduced no evidence that such minor repairs would cost more than $10,000. There is also some question as to the timespan to be used for purposes of compiling such an estimate in an executory contract such as this one.